# CARTER *v.* KENTUCKY

No. 80-5060.   Argued January 14, 1981—Decided March 9, 1981

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 305. STEVENS, J., filed a concurring opinion, in which BRENNAN, J., joined, *post*, p. 307. REHNQUIST, J., filed a dissenting opinion, *post*, p. 307.

*Kevin Michael McNally* argued the cause and filed a brief for petitioner.

*Robert V. Bullock,* Assistant Attorney General of Kentucky, argued the cause for respondent. With him on the brief were *Steven L. Beshear,* Attorney General, and *Richard O. Wyatt,* Assistant Attorney General.

JUSTICE STEWART delivered the opinion of the Court.

In this case a Kentucky criminal trial judge refused a defendant's request to give the following jury instruction: "The [defendant] is not compelled to testify and the fact that he does not cannot be used as an inference of guilt and should not prejudice him in any way." The Supreme Court of Kentucky found no error.[1] We granted certiorari to consider the petitioner's contention that a defendant, upon request,

---

[1] The *per curiam* memorandum opinion of the Supreme Court of Kentucky, *Carter* v. *Commonwealth,* No. 79-SC-452-MR, May 13, 1980, is unreported. But the court's affirmance order is reported in 598 S. W. 2d 763.

has a right to such an instruction under the Fifth and Fourteenth Amendments of the Constitution. 449 U. S. 819.[2]

# I

## A

In the early morning of December 22, 1978, Officer Deborah Ellison of the Hopkinsville, Kentucky, Police Department, on routine patrol in downtown Hopkinsville, noticed something in the alley between Young's Hardware Store and Edna's Furniture Store. She backed her car up, flashed her spotlight down the alley, and saw two men stooped alongside one of the buildings. The men ran off. Officer Ellison drove her squad car down the alley and found a hole in the side of Young's Hardware Store. She radioed Officer Leroy Davis, whom she knew to be in the area, informing him that two men had fled from the alley.

Soon after receiving Ellison's call, Officer Davis saw two men run across a street near where he had been patrolling. The two ran in opposite directions, and Davis proceeded after one of them. Following a chase, during which he twice lost sight of the man he was pursuing, Davis was finally able to stop him. The man was later identified as the petitioner, Lonnie Joe Carter. During the course of the chase, Davis

---

[2] Kentucky is one of at least five States that prohibit giving such an instruction to the jury. Others are Minnesota, see *State* v. *Sandve*, 279 Minn. 229, 232–234, 156 N. W. 2d 230, 233–234, but see *State* v. *Grey*, 256 N. W. 2d 74, 77–78 (the instruction may be necessary in some cases to prevent manifest injustice); Nevada, see *Jackson* v. *State*, 84 Nev. 203, 208, 438 P. 2d 795, 798, Nev. Rev. Stat. § 175.181 (1979); Oklahoma, see *Brannin* v. *State*, 375 P. 2d 276, 279–280 (Crim. App.), *Hanf* v. *State*, 560 P. 2d 207, 212 (Crim. App.); and Wyoming, see *Kinney* v. *State*, 36 Wyo. 466, 472, 256 P. 1040, 1042. A few States have a statutory requirement that such an instruction be given to the jury unless the defendant objects. See, *e. g.,* Conn. Gen. Stat. § 54–84 (1958). The majority of the States, by judicial pronouncement, require that a defense request for such a jury instruction be honored. See, *e. g., Woodward* v. *State*, 234 Ga. 901, 218 S. E. 2d 629.

saw the petitioner drop two objects: a gym bag and a radio tuned to a police band. When apprehended, the petitioner was wearing gloves but no jacket. While Davis was pursuing the petitioner, Officer Ellison inspected the alley near the hole in the building wall. She found two jackets, along with some merchandise that had apparently been removed from the hardware store.

After arresting the petitioner, Davis brought him to Officer Ellison to see if she could identify him as one of the men she had seen in the alley. Ellison noted that he was of similar height and weight to one of the men in the alley, and that he wore similar clothing, but because it had been too dark to get a good view of the men's faces, she could not make a more positive identification. The petitioner was then taken to police headquarters.

## B

The petitioner was subsequently indicted for third-degree burglary of Young's Hardware Store. The indictment also charged him with being a persistent felony offender, in violation of Ky. Rev. Stat. § 532.080 (Supp. 1980), on the basis of previous felony convictions. At the trial, the *voir dire* examination of prospective jurors was conducted solely by the judge.[3] The prosecutor's opening statement recounted the

---

[3] After reading the indictment, and inquiring about possible sources of prejudice, the judge told the venire:

"The fact that this man is under a charge or has been indicted has no weight against him as evidence. It is not evidence of his guilt and is not to be considered by you as evidence of his guilt. It is simply a part of the court process which starts, as I have said, the wheels turning to get the case started to be tried. It means nothing more than that. He sits there before you today presumed by the law to be as innocent as anyone else in this courtroom. I want you to fully understand that. Sometimes it is not easy to do, but you are to put out of your mind the fact that he is accused of this crime to the point where you will consider him in any way guilty until and unless the Commonwealth meets its burden and

evidence expected to be introduced against the petitioner. The opening statement of defense counsel began as follows:

"Let me tell you a little bit about how this system works. If you listened to Mr. Ruff [the prosecutor] you are probably ready to put Lonnie Joe in the penitentiary. He read you a bill, a true bill that was issued by the Grand Jury. Now, the Grand Jury is a group of people that meet back here in a room and the defendant is not able or not allowed to present any of his testimony before this group of people. The only thing that the Grand Jury hears is the prosecution's proof and I would say approximately what Mr. Ruff has said to you. I suppose that most of you would issue a true bill if Mr. Ruff told you what he has just told you and you didn't have a chance to hear what the defendant had to say for himself.

"Now, that is just completely contrary to our system of law. A man, as the Judge has already told you, . . . is innocent until . . . proved guilty . . . ."

The prosecution rested after calling Officers Ellison, Davis, another officer, and the owner of Young's Hardware Store. The trial judge then held a conference, outside of the hearing of the jury, to determine whether the petitioner would testify, and whether the prosecutor would be permitted to impeach the petitioner with his prior felony convictions. Defense counsel stated:

"Judge, I think possibly the only reservation Mr. Carter might have about testifying would be his impeachment by the use of these previous offenses that he is aware of and has told me about. I would like to explain to him in front of you what this all means."

---

by that I mean the Commonwealth must prove his guilt to your satisfaction beyond a reasonable doubt and if they fail to do that, you should find him not guilty. . . ."

Counsel then explained to the petitioner that if he testified the Commonwealth could "use the fact that you have several offenses on your record . . . [to] impeach your . . . propensity to tell the truth . . . ." Counsel added that in his experience this was "a heavy thing; it is very serious, and I think juries take it very seriously . . . ." The judge indicated that under Kentucky law he had "discretionary control" over the use of prior felony convictions for impeachment, and cautioned the prosecutor that he might be inviting a reversal if he introduced more than three prior felony convictions, strongly suggesting that the prosecutor rely on the most recent convictions only. The judge then addressed the petitioner:

> "THE COURT: . . . You can sit there and say nothing and it cannot be mentioned if you don't testify but if you do these other convictions can be shown to indicate to the jury that maybe you are not telling the truth.
>
> .    .    .    .    .    .
>
> "THE COURT: . . . [Y]ou talk to Mr. Rogers [defense counsel] and then tell us what you want to do.
>
> .    .    .    .    .
>
> "THE COURT: Now, Lonnie, you have come back after a private conference with your lawyer, Mr. Rogers[,] and you have told me you have decided not to take the stand?
>
> "LONNIE JOE CARTER: Yes, Sir." [4]

Upon returning to open court, the petitioner's counsel advised the court that there would be no testimony introduced

---

[4] Defense counsel summarized his private conversation with his client for the record, observing that "the advice of counsel to Mr. Carter was that in plain terms he was between a rock and hard place . . . ." If the petitioner testified he would be impeached and "if he didn't testify the jury[,] whether Mr. Ruff comment[ed] on it or not would probably use that against him."

on behalf of the defense. He then requested that the following instruction be given to the jury:

"The [defendant] is not compelled to testify and the fact that he does not cannot be used as an inference of guilt and should not prejudice him in any way."

The trial court refused the request.

The prosecutor began his summation by stating that he intended to review the evidence "that we were privileged to hear," and cautioned the jury to "[c]onsider only what you have heard up here as evidence in this case and not something that you might speculate happened or could have happened . . . ." After mentioning admissions that the petitioner had allegedly made at police headquarters,[5] the prosecutor argued:

"Now that is not controverted whatsoever. It is not controverted that Lonnie Joe is the man that Miss Ellison saw here. It is not controverted that Lonnie Joe is the man that Davis caught up here (again pointing to blackboard sketch). It is not controverted that Lonnie Joe had that bag (pointing to bag on reporter's desk) and that radio (pointing to radio) with him. It is not controverted that both of those jackets belong to Lonnie Joe. At least, that is what he told the police department. But, at any rate, that is all we have to go on . . . ."

The prosecutor continued that if there was a reasonable explanation why the petitioner ran when he saw the police, it was "not in the record."[6]

---

[5] These included the alleged admission that both jackets found in the alley belonged to him.

[6] Defense counsel began his closing argument as follows:

"Ladies and Gentlemen of the jury, I am sure you all right now are wondering well what has happened? Why didn't Mr. Carter take the stand and testify? Let me tell you. The judge just read to you that the man is presumed innocent and that it is up to the prosecution to prove him

The jury found the petitioner guilty, recommending a sentence of two years. The recidivist phase of the trial followed. The prosecutor presented evidence of the previous felony convictions that had been listed in the indictment. The defense presented no evidence, and the jury found the petitioner guilty as a persistent offender, sentencing him to the maximum term of 20 years in prison.

Upon appeal, the Kentucky Supreme Court rejected the argument that the Fifth and Fourteenth Amendments to the United States Constitution require that a criminal trial judge give the jury an instruction such as was requested here. In concluding that the trial judge did not commit error by refusing to give the requested instruction, the court pointed to Ky. Rev. Stat. § 421.225 (Supp. 1980), which provides:

> "In any criminal or penal prosecution the defendant, on his own request, shall be allowed to testify in his own behalf, but his. failure to do so shall not be commented upon or create any presumption against him."

Holding that the jury instruction requested by counsel would have required the trial judge to "comment upon" the defendant's failure to testify, the court cited its previous decision in *Green* v. *Commonwealth,* 488 S. W. 2d 339, as controlling.

## II

### A

The constitutional question presented by this case is one the Court has specifically anticipated and reserved, first in *Griffin* v. *California,* 380 U. S. 609, 615, n. 6, and more recently in *Lakeside* v. *Oregon,* 435 U. S. 333, 337. But, as a question of federal statutory law, it was resolved by a unanimous Court over 40 years ago in *Bruno* v. *United States,* 308 U. S. 287. The petitioner in *Bruno* was a defendant in a federal criminal

---

guilty beyond a reasonable doubt. He doesn't have to take the stand in his own behalf. He doesn't have to do anything."

trial who had requested a jury instruction similar to the one requested by the petitioner in this case.[7] The Court, addressing the question whether Bruno "had the indefeasible right" that his proffered instruction be given to the jury, decided that a federal statute,[8] which prohibits the creation of any presumption from a defendant's failure to testify, required that the "substance of the denied request should have been granted . . . ." *Id.*, at 294.[9]

[7] Bruno asked the trial judge to instruct the jury as follows:

"The failure of any defendant to take the witness stand and testify in his own behalf, does not create any presumption against him; the jury is charged that it must not permit that fact to weigh in the slightest degree against any such defendant, nor should this fact enter into the discussions or deliberations of the jury in any manner." 308 U. S., at 292.

[8] Act of Mar. 16, 1878, ch. 37, 20 Stat. 30, now 18 U. S. C. § 3481, which states in pertinent part:

"In a trial of all persons . . . [the defendant] shall, at his own request, be a competent witness. His failure to make such a request shall not create any presumption against him."

[9] At common law, defendants in criminal trials could not be compelled to furnish evidence against themselves, but they were also not permitted to testify. In the context of the original enactment of the federal statute found dispositive in the *Bruno* case, this Court commented on the alteration of this common-law rule: "This rule, while affording great protection to the accused against unfounded accusation, in many cases deprived him from explaining [incriminating] circumstances . . . . To relieve him from this embarrassment the law was passed. . . . [He] is by the act in question permitted . . . to testify . . . ." *Wilson* v. *United States,* 149 U. S. 60, 65–66. Following enactment of the federal statute, the States followed suit with similar laws. See Dills, The Permissibility of Comment on the Defendant's Failure to Testify in His Own Behalf in Criminal Proceedings, 3 Wash. L. Rev. 161, 164–165 (1928); 8 J. Wigmore, Evidence § 2272, p. 427 (J. McNaughton rev. 1961).

The issue in *Wilson, supra,* was whether it was error for the prosecutor to comment adversely on the defendant's failure to testify. The Court unanimously held that it was, observing that "[n]othing could have been more effective with the jury to induce them to disregard entirely the presumption of innocence to which by the law he was entitled . . . ." 149 U. S., at 66. As later in *Bruno,* however, the Court did not reach any Fifth Amendment issue.

The *Griffin* case came here shortly after the Court had held that the Fifth Amendment command that no person "shall be compelled in any criminal case to be a witness against himself" is applicable against the States through the Fourteenth Amendment. *Malloy* v. *Hogan,* 378 U. S. 1.[10] In *Griffin,* the Court considered the question whether it is a violation of the Fifth and Fourteenth Amendments to invite a jury in a state criminal trial to draw an unfavorable inference from a defendant's failure to testify. The trial judge had there instructed the jury that "a defendant has a constitutional right not to testify," and that the defendant's exercise of that right "does not create a presumption of guilt nor by itself warrant an inference of guilt" nor "relieve the prosecution of any of its burden of proof." But the instruction additionally permitted the jury to "take that failure into consideration as tending to indicate the truth of [the State's] evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable." 380 U. S., at 610.

This Court set aside Griffin's conviction because "the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.,* at 615.[11] It condemned adverse comment on a defendant's failure to testify as reminiscent of the " 'inquisitorial system of criminal jus-

---

[10] The *Malloy* case overruled *Twining* v. *New Jersey,* 211 U. S. 78, and *Adamson* v. *California,* 332 U. S. 46, both of which had "adhered to the position that the Federal Constitution does not require the States to accord the Fifth Amendment privilege against self-incrimination." *Tehan* v. *United States ex rel. Shott,* 382 U. S. 406, 412. *Malloy* established that the same standards determine the validity of claims of Fifth Amendment privilege "whether . . . in a state or federal court." 378 U. S., at 11.

[11] The Court in the *Griffin* case expressly reserved decision "on whether an accused can require . . . that the jury be instructed that his silence must be disregarded." 380 U. S., at 615, n. 6.

tice,'" *id.*, at 614, quoting *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52, 55, and concluded that such comment effected a court-imposed penalty upon the defendant that was unacceptable because "[i]t cuts down on the privilege by making its assertion costly." 380 U. S., at 614.[12]

The Court returned to a consideration of the Fifth Amendment and jury instructions in *Lakeside* v. *Oregon*, 435 U. S. 333, where the question was whether the giving of a "no-inference" instruction over defense objection violates the Constitution. Despite trial counsel's complaint that his strategy was to avoid any mention of his client's failure to testify, a no-inference instruction [13] was given by the trial judge. The petitioner contended that when a trial judge in any way draws the jury's attention to a defendant's failure to testify, unless the defendant acquiesces, the court invades the defendant's privilege against compulsory self-incrimination. This argument was rejected.

The *Lakeside* Court reasoned that the Fifth and Fourteenth Amendments bar only *adverse* comment on a defendant's failure to testify, and that "a judge's instruction that the jury must draw *no* adverse inferences of any kind from the defendant's exercise of his privilege not to testify is 'comment' of an entirely different order." *Id.*, at 339. The purpose of such an instruction, the Court stated, "is to remove from the jury's deliberations any influence of unspoken adverse inferences," and "cannot provide the pressure on a defendant found impermissible in *Griffin*." *Ibid.*

---

[12] In *Tehan* v. *United States ex rel. Shott, supra,* it was decided that *Griffin* was not to be given retroactive application.

[13] The *Lakeside* trial judge gave the following instruction to the jury: "Under the laws of this State a defendant has the option to take the witness stand in his or her own behalf. If a defendant chooses not to testify, such a circumstance gives rise to no inference or presumption against the defendant, and this must not be considered by you in determining the question of guilt or innocence." 435 U. S., at 335.

The Court observed in *Lakeside* that the petitioner's argument there rested on "two very doubtful assumptions:"

"First, that the jurors have not noticed that the defendant did not testify and will not, therefore, draw adverse inferences on their own. Second, that the jurors will totally disregard the instruction, and affirmatively give weight to what they have been told not to consider at all. Federal constitutional law cannot rest on speculative assumptions so dubious as these." *Id.,* at 340 (footnote omitted).

Finally, the Court stressed that "[t]he very purpose" of a jury instruction is to direct the jurors' attention to important legal concepts "that must not be misunderstood, such as reasonable doubt and burden of proof," and emphasized that instruction "in the meaning of the privilege against compulsory self-incrimination is no different." *Ibid.*

### B

The inclusion of the privilege against compulsory self-incrimination [14] in the Fifth Amendment

"reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; . . . our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual balance by requiring the government . . . , in its contest with the individual to shoulder the entire load,' . . . ; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes

---

[14] For the history and development of the privilege, which has its roots in English and American revulsion against the inquisitorial practices of the Star Chamber and High Commission, see L. Levy, Origins of the Fifth Amendment (1968); E. Cleary, McCormick on Evidence § 114 (2d ed. 1972); 8 J. Wigmore, Evidence § 2250 (J. McNaughton rev. 1961).

'a shelter to the guilty,' is often 'a protection to the innocent.'" *Murphy* v. *Waterfront Comm'n, supra,* at 55.[15]

The principles enunciated in our cases construing this privilege, against both statutory and constitutional backdrops, lead unmistakably to the conclusion that the Fifth Amendment requires that a criminal trial judge must give a "no-adverse-inference" jury instruction when requested by a defendant to do so.

In *Bruno,* the Court declared that the failure to instruct as requested was not a mere "technical erro[r] . . . which do[es] not affect . . . substantial rights . . . ." It stated that the "right of an accused to insist on" the privilege to remain silent is "[o]f a very different order of importance . . ." from the "mere etiquette of trials and . . . the formalities and minutiae of procedure." 308 U. S., at 293–294. Thus, while the *Bruno* Court relied on the authority of a federal statute, it is plain that its opinion was influenced by the absolute constitutional guarantee against compulsory self-incrimination.[16]

---

[15] The Court has recognized that there are many reasons unrelated to guilt or innocence for declining to testify:

"It is not every one who can safely venture on the witness stand though entirely innocent of the charge against him. Excessive timidity, nervousness when facing others and attempting to explain transactions of a suspicious character, and offences charged against him, will often confuse and embarrass him to such a degree as to increase rather than remove prejudices against him. It is not every one, however honest, who would, therefore, willingly be placed on the witness stand." *Wilson* v. *United States,* 149 U. S., at 66.

Other reasons include the fear of impeachment by prior convictions (the petitioner's fear in the present case), or by other damaging information not necessarily relevant to the charge being tried, *Griffin,* 380 U. S., at 615, and reluctance to "incriminate others whom [defendants] either love or fear," *Lakeside,* 435 U. S., at 344, n. 2 (dissenting opinion).

[16] In *Griffin,* the Court relied on the statutory opinion in *Wilson,* replacing the words "act" and "statute" with the words "Fifth Amendment." 380 U. S., at 613. The same can be done here with respect to the Court's opinion in *Bruno:* when "Congress" is replaced with "the Fifth Amend-

The *Griffin* case stands for the proposition that a defendant must pay no court-imposed price for the exercise of his constitutional privilege not to testify. The penalty was exacted in *Griffin* by adverse comment on the defendant's silence; the penalty may be just as severe when there is no adverse comment, but when the jury is left to roam at large with only its untutored instincts to guide it, to draw from the defendant's silence broad inferences of guilt. Even without adverse comment, the members of a jury, unless instructed otherwise, may well draw adverse inferences from a defendant's silence.[17]

The significance of a cautionary instruction was forcefully acknowledged in *Lakeside,* where the Court found no constitutional error even when a no-inference instruction was given over a defendant's objection. The salutary purpose of the instruction, "to remove from the jury's deliberations any influence of unspoken adverse inferences," was deemed so important that it there outweighed the defendant's own preferred tactics.[18]

---

ment," "the spirit of the Self-Incrimination Clause is reflected." *Griffin,* 380 U. S., at 613–614.

[17] Indeed, the dissenting opinion in *Griffin* suggested that more harm may flow from the lack of guidance to the jury on the meaning of the Fifth Amendment privilege than from reasonable comment upon the exercise of that privilege. With specific reference to decisions from Kentucky and one other State, the dissenters observed that "[w]ithout limiting instructions, the danger exists that the inferences drawn by the jury may be unfairly broad." *Id.,* at 623. The Court in *Griffin* indicated no disagreement with this view.

[18] It has been almost universally thought that juries notice a defendant's failure to testify. "[T]he jury will, of course, realize this quite evident fact, even though the choice goes unmentioned. . . . [It is] a fact inescapably impressed on the jury's consciousness." *Griffin, supra,* at 621, 622 (dissenting opinion). In *Lakeside* the Court cited an acknowledged authority's statement that " '[t]he layman's natural first suggestion would probably be that the resort to privilege in each instance is a clear confession of crime.' " 435 U. S., at 340, n. 10, quoting 8 J. Wigmore, Evidence § 2272, p. 426 (J. McNaughton rev. 1961).

We have repeatedly recognized that "instructing a jury in the basic constitutional principles that govern the administration of criminal justice," *Lakeside*, 435 U. S., at 342, is often necessary.[19] Jurors are not experts in legal principles; to function effectively, and justly, they must be accurately instructed in the law. Such instructions are perhaps nowhere more important than in the context of the Fifth Amendment privilege against compulsory self-incrimination, since "[t]oo many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are . . . guilty of crime . . . ." *Ullman* v. *United States*, 350 U. S. 422, 426. And, as the Court has stated, "we have not yet attained that certitude about the human mind which would justify us in . . . a dogmatic assumption that jurors, if properly admonished, neither could nor would heed the instructions of the trial court . . . ." *Bruno*, 308 U. S., at 294.[20]

---

[19] In *Taylor* v. *Kentucky*, 436 U. S. 478, the Court held that the Due Process Clause requires that instructions be given on the presumption of innocence and the lack of evidentiary significance of an indictment. The Court recognized that an instruction on the presumption of innocence has a "salutary effect upon lay jurors," and that "the ordinary citizen well may draw significant additional guidance" from such an instruction. *Id.*, at 484. The Court stressed the "purging" effect of the instruction and the need to protect "the accused's constitutional right to be judged solely on the basis of proof adduced at trial." *Id.*, at 486. The same can be said, of course, with respect to the privilege of remaining silent. Indeed, the claim is even more compelling here than in *Taylor*, where the dissenting opinion noted that "the omission [in Taylor's trial] did not violate a specific constitutional guarantee, such as the privilege against compulsory self-incrimination." *Id.*, at 492 (STEVENS, J.) (footnote omitted).

[20] "It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." *Starr* v. *United States*, 153 U. S. 614, 626. For modern empirical support of this longstanding assumption, see Reed, Jury Simulation: The Impact of Judge's Instructions and Attorney Tactics on Decisionmaking, 71 J. Crim. L. & C. 68 (1980); Bridgeman & Mar-

A trial judge has a powerful tool at his disposal to protect the constitutional privilege—the jury instruction—and he has an affirmative constitutional obligation to use that tool when a defendant seeks its employment. No judge can prevent jurors from speculating about why a defendant stands mute in the face of a criminal accusation, but a judge can, and must, if requested to do so, use the unique power of the jury instruction to reduce that speculation to a minimum.[21]

## C

The only state interest advanced by Kentucky in refusing a request for such a jury instruction is protection of the defendant: "the requested 'no inference' instruction . . . would have been a direct 'comment' by the court and would have emphasized the fact that the accused had not testified in his own behalf." *Green* v. *Commonwealth,* 488 S. W. 2d, at 341. This purported justification was specifically rejected in the *Lakeside* case, where the Court noted that "[i]t would be strange indeed to conclude that this cautionary instruction violates the very constitutional provision it is intended to protect." 435 U. S., at 339.

Kentucky also argues that in the circumstances of this case the jurors knew they could not make adverse inferences from the petitioner's election to remain silent because they were instructed to determine guilt "from the evidence alone," and because failure to testify is not evidence. The Commonwealth's argument is unpersuasive. Jurors are not lawyers; they do not know the technical meaning of "evidence."

lowe, 64 J. Applied Psychology 91 (1979); Cornish & Sealy, Juries and the Rules of Evidence, 1973 Crim. L. Rev. 208, 217–218, 222; Forston, Judge's Instructions: A Quantitative Analysis of Jurors' Listening Comprehension, 18 Today's Speech No. 4, p. 34 (1970).

[21] The importance of a no-inference instruction is underscored by a recent national public opinion survey conducted for the National Center for State Courts, revealing that 37% of those interviewed believed that it is the responsibility of the accused to prove his innocence. 64 A. B. A. J. 653 (1978).

They can be expected to notice a defendant's failure to testify, and, without limiting instruction, to speculate about incriminating inferences from a defendant's silence.

The other trial instructions and arguments of counsel that the petitioner's jurors heard at the trial of this case were no substitute for the explicit instruction that the petitioner's lawyer requested. Although the jury was instructed that "[t]he law presumes a defendant to be innocent," it may be doubted that this instruction contributed in a significant way to the jurors' proper understanding of the petitioner's failure to testify. Without question, the Fifth Amendment privilege and the presumption of innocence are closely aligned. But these principles serve different functions, and we cannot say that the jury would not have derived "significant additional guidance," *Taylor* v. *Kentucky,* 436 U. S. 478, 484, from the instruction requested. See *United States* v. *Bain,* 596 F. 2d 120 (CA5); *United States* v. *English,* 409 F. 2d 200, 201 (CA3). And most certainly, defense counsel's own argument that the petitioner "doesn't have to take the stand . . . [and] doesn't have to do anything" cannot have had the purging effect that an instruction from the judge would have had. "[A]rguments of counsel cannot substitute for instructions by the court." *Taylor* v. *Kentucky, supra,* at 489.[22]

Finally, Kentucky argues that because the evidence of petitioner's guilt was "overwhelming and could not be explained," any constitutional error committed by the state courts was harmless. *Chapman* v. *California,* 386 U. S. 18. While it is arguable that a refusal to give an instruction similar to the one that was requested here can never be harmless, cf. *Bruno, supra,* at 293, we decline to reach the issue, because it was not presented to or considered by the Supreme Court of Kentucky. See *Sandstrom* v. *Montana,* 442 U. S. 510, 527.

---

[22] See n. 20, *supra.*

## III

The freedom of a defendant in a criminal trial to remain silent "unless he chooses to speak in the unfettered exercise of his own will" is guaranteed by the Fifth Amendment and made applicable to state criminal proceedings through the Fourteenth. *Malloy* v. *Hogan,* 378 U. S., at 8. And the Constitution further guarantees that no adverse inferences are to be drawn from the exercise of that privilege. *Griffin* v. *California,* 380 U. S. 609. Just as adverse comment on a defendant's silence "cuts down on the privilege by making its assertion costly," *id.,* at 614, the failure to limit the jurors' speculation on the meaning of that silence, when the defendant makes a timely request that a prophylactic instruction be given, exacts an impermissible toll on the full and free exercise of the privilege. Accordingly, we hold that a state trial judge has the constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify.

For the reasons stated, the judgment is reversed, and the case is remanded to the Supreme Court of Kentucky for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, concurring.

Although joining the opinion of the Court, I write briefly to make clear that, for me, this result is required by precedent, not by what I think the Constitution should require.

The Fifth Amendment, applicable to the States through the Fourteenth, provides that no person "shall be compelled in any criminal case to be a witness against himself." The question in *Griffin* v. *California,* 380 U. S. 609 (1965), was whether this proscription was violated if jurors were told that they could draw inferences from a defendant's failure to testify. The Court held that neither the judge nor the prosecutor could suggest that jurors draw such inferences.

A defendant who *chooses not to testify* hardly can claim that he was *compelled to testify.* The Court also held, nevertheless, that any "penalty imposed by courts for exercising [this] constitutional privilege" cannot be tolerated because "[i]t cuts down on the privilege by making its assertion costly." *Id.,* at 614.

Justice Stewart's dissenting opinion in *Griffin,* in which Justice White joined, responded persuasively to this departure from the language and purpose of the Self-Incrimination Clause. Justice Stewart wrote:

> "We must determine whether the petitioner has been 'compelled . . . to be a witness against himself.' Compulsion is the focus of the inquiry. Certainly, if any compulsion be detected in the California procedure, it is of a dramatically different and less palpable nature than that involved in the procedures which historically gave rise to the Fifth Amendment guarantee. . . .
>
> "I think that the Court in this case stretches the concept of compulsion beyond all reasonable bounds, and that whatever compulsion may exist derives from the defendant's choice not to testify, not from any comment by court or counsel. . . . [T]he jury will, of course, realize th[e] quite evident fact [that the defendant has chosen not to testify], even though the choice goes unmentioned." *Id.,* at 620–621.

The one person who usually knows most about the critical facts is the accused. For reasons deeply rooted in the history we share with England, the Bill of Rights included the Self-Incrimination Clause, which enables a defendant in a criminal trial to elect to make no contribution to the fact-finding process. But nothing in the Clause requires that jurors not draw logical inferences when a defendant chooses not to explain incriminating circumstances. Jurors have been instructed that the defendant is presumed to be innocent and that this presumption can be overridden only by

evidence beyond a reasonable doubt. California Chief Justice Traynor commented that judges and prosecutors should be able to explain that "a jury [may] draw unfavorable inferences from the defendant's failure to explain or refute evidence when he could reasonably be expected to do so. Such comment would not be evidence and would do no more than make clear to the jury the extent of its freedom in drawing inferences." Traynor, The Devils of Due Process in Criminal Detection, Detention, and Trial, 33 U. Chi. L. Rev. 657, 677 (1966); accord, Schaefer, Police Interrogation and the Privilege Against Self-Incrimination, 61 Nw. U. L. Rev. 506, 520 (1966).

I therefore would have joined JUSTICES STEWART and WHITE in dissent in *Griffin*. But *Griffin* is now the law, and based on that case the present petitioner was entitled to the jury instruction that he requested. I therefore join the opinion of the Court.

JUSTICE STEVENS, with whom JUSTICE BRENNAN joins, concurring.

While I join the Court's opinion, I add this comment to emphasize that today's holding is limited to cases in which the defendant has requested that the jury be instructed not to draw an inference of guilt from the defendant's failure to testify. I remain convinced that the question whether such an instruction should be given in any specific case—like the question whether the defendant should testify on his own behalf—should be answered by the defendant and his lawyer, not by the State. See *Lakeside* v. *Oregon*, 435 U. S. 333, 343–348 (1978) (STEVENS, J., dissenting).

JUSTICE REHNQUIST, dissenting.

The Court has reached its conclusion in this case by a series of steps only the first of which is traceable to the United States Constitution. Yet since the result of the Court's decision is to reverse the judgment of the Supreme

Court of Kentucky, the decision must obviously rest upon the fact that the decision of that court is inconsistent with the United States Constitution.

As the Court points out, the constitutional question presented by this case is one the Court has specifically anticipated and reserved, first in *Griffin* v. *California,* 380 U. S. 609, 615, n. 6 (1965), and more recently in *Lakeside* v. *Oregon,* 435 U. S. 333 (1978).

But the Court, with a singular paucity of reasoning, points to the fact that in a case arising in the federal system, a defendant requesting a charge similar to that which petitioner requested here was held by this Court to be entitled to it. The differences, of course, are obvious: In the first place, the case of *Bruno* v. *United States,* 308 U. S. 287 (1939), was governed by the federal statute there cited:

> "The accused could 'at his own request but not otherwise be a competent witness. And his failure to make such a request shall not create any presumption against him.' Such was the command of the law-makers. The only way Congress could provide that abstention from testifying should not tell against an accused was by an implied direction to judges to exercise their traditional duty in guiding the jury by indicating the considerations relevant to the latter's verdict on the facts. . . . . Concededly the charge requested by Bruno was correct. The Act of March 16, 1878, gave him the right to invoke it." *Id.,* at 292–293.

Here, of course, the Act of March 16, 1878, does not attempt to govern the procedures or instructions which shall be given in the trial courts of Kentucky. Therefore the Act of Congress which, in *Bruno,* was stated to entitle a defendant to a charge that no presumption should arise from his refusal to take the stand, is of no relevance whatever to the Court's decision in this case.

If we begin with the relevant provisions of the Constitu-

tion, which is where an unsophisticated lawyer or layman would probably think we should begin, we find the provision in the Fifth Amendment stating that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." Until the mysterious process of transmogrification by which this Amendment was held to be "incorporated" and made applicable to the States by the Fourteenth Amendment in *Malloy* v. *Hogan,* 378 U. S. 1 (1964), the provision itself would not have regulated the conduct of criminal trials in Kentucky. But even if it did, no one here claims that the defendant was forced to take the stand against his will or to testify against himself inconsistently with the provisions of the Fifth Amendment. The claim is rather that in *Griffin* v. *California, supra,* the Court, building on the language of the Constitution itself and on *Malloy, supra,* held that a charge to the effect that any evidence or facts adduced against the defendant which he could be reasonably expected to deny or explain could be taken into consideration by the jury violated the constitutional privilege against compulsory self-incrimination. The author of the present opinion dissented from that holding, stating:

> "The formulation of procedural rules to govern the administration of criminal justice in the various States is properly a matter of local concern. We are charged with no general supervisory power over such matters; our only legitimate function is to prevent violations of the Constitution's commands." 380 U. S., at 623.

But even *Griffin, supra,* did not go as far as the present opinion, for as that opinion makes clear it left open the question of whether a state-court defendant was entitled as a matter of right to a charge that his refusal to take the stand should not be taken into consideration against him by the jury. The Court now decides that he is entitled to such a charge, and, I believe, in doing so, wholly retreats from the statement in the *Griffin* dissent that "[t]he formulation of

procedural rules to govern the administration of criminal justice in the various States is properly a matter of local concern."

The Court's opinion states, *ante*, at 301, that "[t]he *Griffin* case stands for the proposition that a defendant must pay no court-imposed price for the exercise of his constitutional privilege not to testify." Such Thomistic reasoning is now carried from the constitutional provision itself, to the *Griffin* case, to the present case, and where it will stop no one can know. The concept of "burdens" and "penalties" is such a vague one that the Court's decision allows a criminal defendant in a state proceeding virtually to take from the trial judge any control over the instructions to be given to the jury in the case being tried. I can find no more apt words with which to conclude this dissent than those stated by Justice Harlan, concurring in the Court's opinion in *Griffin:*

"Although compelled to concur in this decision, I am free to express the hope that the Court will eventually return to constitutional paths which, until recently, it has followed throughout its history." 380 U. S., at 617.