Obadyah BEN–YISRAYL, f/k/a
Christopher Peterson,
Petitioner,

v.

Cecil DAVIS, Respondent.

No. 3:01–CV–0871 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

July 23, 2003.

John H Gallo, Denise D Keliuotis, Kelly J Cox, Sidley Austin Brown & Wood LLP, Chicago, IL, for Petitioner.

James B Martin, Gary Damon Secrest, Indiana Attorney General, Indianapolis, IN, for Respondents.

### MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

This proceeding is a petition filed by counsel on behalf of the petitioner, Obadyah Ben–Yisrayl f/k/a Christopher Peterson, seeking relief under 28 U.S.C. § 2254 from a state court criminal proceeding in which he was sentenced to death. Two published opinions of the Supreme Court of Indiana will provide the basic factual setting of this case. In *Ben–Yisrayl v. State*, 690 N.E.2d 1141 (Ind.1997), all of the justices of the Supreme Court of Indiana concurred in the result and Justice Sullivan wrote a separate concurring opinion. In *Ben–Yisrayl v. State*, 753 N.E.2d 649 (Ind.2001), the unanimous decision of the Supreme Court of Indiana was written by Chief Justice Shepard and entered on August 28, 2001. Certainly as a generalized proposition, the facts found by the highest court of the State of Indiana is entitled to a rebuttable presumption of correctness under 28 U.S.C. § 2254(e)(1), and the burden is on the petitioner in that issue to otherwise show the same by clear and convincing evidence.

The massive state record has been filed and examined here pursuant to the mandates of *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), as well as 28 U.S.C. § 2244(b).

In *Price v. Vincent*, ―― U.S. ――, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003), the United States Supreme Court repeated that,

> under § 2254 it must be shown that the [state] Supreme Court's decision was either contrary to, or an unreasonable application of, [the United State Supreme Court's] clearly established precedents, or was based upon an unreasonable determination of the facts.

*Price* at 1852–53. The court went on to explain that

> a decision by a state court is "contrary to" our clearly established law if it "applies a rule that contradicts the governing law set forth in our cases or if it confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."
>
> . . .
>
> As we have explained, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied a [United States] Supreme Court case incorrectly. Rather it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.

*Price* at 1853 (quotation marks, citations and brackets omitted). *See also Early v. Packer*, 537 U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002), *Woodford v. Visciotti*, 537 U.S. 19, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002), and *Wiggins v. Smith*, ―― U.S. ――, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

The petitioner has raised many issues, but when it is all said and done, the court need only address two issues. Since the writ will issue for both of these reasons, the court declines to address the remaining issues. The first meritorious issue concerns comments made by the prosecutor during closing argument and the second concerns the accuracy of the trial transcript.

### I.  PROSECUTORIAL MISCONDUCT

█ The petitioner argues that the prosecutor made remarks during closing

argument which violated the 5th Amendment by commenting on his failure to testify.

> I told you in the opening statement that the Defendant confessed to killing these four people with his shotgun. We proved that. We told you that was the cornerstone of our case and why? Because it is self evidence [sic] that no one freely and voluntarily confesses to a murder unless they're guilty. Let the Defendant tell you why somebody would freely and voluntarily confess to—

Trial Record at 5568. At that point, both defense counsel objected. During the ensuing overlapping conversations of both defense counsel and the prosecutor, the transcript includes two fragments from the prosecutor.

> —on general, why—
>
> . . .
>
> —defendant's counsel can say why a person can confess to a crime.

Trial Record at 5568. Defense counsel made a motion for a mistrial which was taken under advisement and subsequently denied. Continuing with his closing argument, the prosecutor persisted in making similar comments which, while not specifically repeating his implicit question about the defendant's failure to testify, continued to refocus the jury's attention on that Constitutionally impermissible question.

> I said the .confessions were the cornerstone of our case because it's self evidence [sic] that no one, anybody, nobody will ever confess to a murder free-

ly and voluntarily unless they commit [sic] it.

Trial Record at 5570.

> So if you believe that there isn't any reason for somebody to admit to murder unless they did it, you're there.

Trial Record at 5573.

> What are the chances that 'if somebody falsely accuses me of murder that within 24 hours I'm going to falsely admit to it[?] They don't match. I mean it just doesn't make sense. It's—two things don't make sense.

Trial Record at 5575.

### A.

The Supreme Court of Indiana addressed this question of prosecutorial misconduct both in its opinion on direct appeal and in the appeal of the post conviction relief petition. On direct appeal, the court found that when the prosecutor said, "Let the Defendant tell you why . . ." he was referring to defense counsel rather than to the defendant personally. *Ben–Yisrayl v. State*, 690 N.E.2d 1141, 1148 n. 17 (Ind. 1997). The petitioner argues that nowhere else in the record does the prosecutor refer to the defense counsel as "the defendant" and the respondent has not directed this court's attention to a single location where such a reference was made. The petitioner cites to 29 instances where this prosecutor referred to the defendant/petitioner as "the defendant" during the opening statement[1] and the examination of witnesses.[2]

More relevant, though, are the times when this prosecutor said "the defendant" during closing argument because these statements were made in immediate proximity to the instance in question. The court has found 7 instances[3] where this

---

**1.** 21 instances during opening argument (T.R. Page Number:Line Number. 2104:8, 2104:21, 2106:15, 2106:17, 2107:4, 2108:8, 2108:18, 2108:20, 2108:24, 2110:1, 2110:9, 2110:13, 2110:14, 2110:24).

**2.** Eight instances during witness examination. (T.R. Page Number:Line Number. 2167:16,

2167:20, 2168:24, 2168:24, 2212:20, 2213:7, 2913:1, 2913:22.) The petitioner also notes two other instances where another prosecutor made similar references. (T.R. Page Number:Line Number. 2272:9, and 2635:21.)

**3.** T.R. Page Number:Line Number. 5554:22, 5555:17, 5556:10, 5556:22, 5557:1, 5567:25, 5568:4.

prosecutor was referring to the defendant/petitioner as "the defendant" during closing argument prior to the instance in question, and 49 instances[4] thereafter. In contrast, the court has found one instance[5] where this prosecutor was referring to defense counsel as "the defendant" during closing argument prior to the instance in question, and 4 instances[6] thereafter.

The Supreme Court of Indiana concluded that the prosecutor was intending to refer to defense counsel when he said "the defendant". This may well be true, but what is relevant is what the jury understood. Within this prosecutor's closing argument he said "the defendant" 62 times. Any reasonable person would clearly understand 56 of those instances to refer personally to the defendant/petitioner and another 5 of those instances to one or both of the defense attorneys. The sole potentially confusing instance is the one in question. While lawyers and jurists can reasonably debate what was meant, the common definition of "the defendant" refers individually to the one person on trial.

It is the opinion of this court that within the context in which it was used, reasonable jurors would have understood the prosecutor to be referring individually to the defendant. Furthermore, they would have believed that he was commenting on the defendant's failure to testify and asking them to thereby draw the inference of the defendant's guilt. Therefore, this court must find that it was an unreasonable determination of the facts to conclude that the prosecutor was referring to defense counsel.

Five lines before the prosecutor says, "Let the Defendant tell you why somebody would freely and voluntarily confess ....", he told the jury that "the Defendant confessed to killing these four people with his shotgun." Trial Record at 5568. Clearly the prosecutor did not mean to say that defense counsel confessed to these crimes and equally clearly, the jury would not have understood that it was the defense counsel who was being asked to explain the confession.

## B.

■ The Supreme Court of Indiana, on direct appeal, considered three prior Indiana cases in analyzing this question of prosecutorial misconduct. It did not cite any United States Supreme Court cases. The case of *Taylor v. State*, 587 N.E.2d 1293 (Ind.1992) was cited for the proposition that, "[w]hen a defendant's motion for mistrial is denied, reversible error exists only if that denial subjects the defendant to grave peril." *Ben–Yisrayl v. State*, 690 N.E.2d 1141, 1149 (Ind.1997). In *Taylor*, the court affirmed the trial court's denial of a motion for mistrial where some jurors overheard conversations at lunch which were related to the criminal trial for which they were impaneled.

The case of *Steele v. State*, 672 N.E.2d 1348 (Ind.1996) was cited for the proposition that, "[o]n appeal, the trial court's decision [to deny a mistrial] is reviewed only for an abuse of discretion." *Ben–Yisrayl v. State*, 690 N.E.2d 1141, 1149 (Ind.1997). In *Steele*, the court affirmed the trial court's denial of a motion for

**4.** T.R. Page Number:Line Number. 5570:21, 5571:8, 5571:13, 5571:16, 5571:20, 5571:22, 5572:1, 5572:11, 5573:8, 5573:12, 5573:21, 5573:21, 5573:23, 5573:24, 5574:2, 5574:5, 5574:13, 5574:23, 5574:25, 5575:1, 5575:8, 5575:21, 5576:2, 5576:2, 5576:6, 5576:8, 5576:9, 5576:13, 5576:17, 5576:22, 5578:1, 5578:3, 5578:10, 5578:14, 5579:1, 5579:2, 5579:13, 5580:1, 5581:5, 5583:4, 5583:20, 5583:22, 5585:4, 5585:18, 5585:22, 5585:23, 5586:19, 5588:3, 5589:8.

**5.** T.R. Page Number:Line Number. 5567:14.

**6.** T.R. Page Number:Line Number. 5573:13, 5580:5, 5582:2, 5588:14.

mistrial where the defendant's brother was called to the stand but refused to testify.

The case of *Moore v. State*, 669 N.E.2d 733 (Ind.1996) was cited for the proposition that, "[t]he Fifth Amendment privilege against compulsory self-incrimination is violated when a prosecutor makes a statement that is subject to reasonable interpretation by a jury as an invitation to draw an adverse inference from a defendant's silence." *Ben–Yisrayl v. State*, 690 N.E.2d 1141, 1149 (Ind.1997) *quoting Moore* at 739. In *Moore*, the court affirmed a conviction where the prosecutor stated that the defendant "didn't choose to testify which is his right, and he certainly doesn't, isn't compelled to testify...." *Moore* at 735 (emphasis omitted).

The Supreme Court of Indiana, on appeal of the post conviction relief petition, mentioned and discussed the prosecutorial comment in conjunction with reviewing another question, but it did not independently re-analyze the issue nor did it cite to any cases other than its own opinion on the direct appeal.

As *Price, Early, Woodford*, and *Wiggins* make clear, this court may not grant the writ where the State Supreme Court reasonably applied United States Supreme Court cases and precedents. Here, it is not possible to find that such cases were reasonably applied to the facts of this case because no United States Supreme Court cases were discussed by the Supreme Court of Indiana in connection with this claim of prosecutorial misconduct.

### C.

In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court reversed the convictions of two defendants when comments made by the prosecutor violated their Fifth Amendment right against self-incrimination. The prosecutor during cross examination questioned why they had not told their alibis to the police at the time they were arrested. The court held that, "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." *Doyle* at 619, 96 S.Ct. 2240.

> [C]omment on the refusal to testify is a remnant of the inquisitorial system of criminal justice, which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly. It is said, however, that the inference of guilt for failure to testify as to facts peculiarly within the accused's knowledge is in any event natural and irresistible, and that comment on the failure does not magnify that inference into a penalty for asserting a constitutional privilege. What the jury may infer, given no help from the court, is one thing. What it may infer when the court solemnized the silence of the accused into evidence against him is quite another.

*Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (citations and quotation marks omitted). "[T]he Fifth Amendment ... forbids ... comment by the prosecution on the accused's silence...." *Griffin* at 615, 85 S.Ct. 1229.

The inclusion of the privilege against compulsory self-incrimination in the Fifth Amendment reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates a fair state-individual balance by requiring the government in its contest with the individual to shoulder the entire load, our dis-

trust of self-deprecatory statements; and our realization that the privilege, while sometimes a shelter to the guilty, is often a protection to the innocent. *Carter v. Kentucky,* 450 U.S. 288, 299, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981) ·(citations, ellipsis, and quotation marks omitted).

This Court has some considerable difficulty in removing the prosecutor's references in final argument from the operation of *Doyle, Griffin,* and *Carter.* Certainly the Supreme Court of the United States, in *Price, Early, Woodford,* and *Wiggins,* pointedly admonished district courts and federal courts of appeal to give a very considerable deference to the state court criminal judicial process, but unfortunately the Supreme Court of Indiana did not address this question of prosecutorial misconduct under *Doyle, Griffin, Carter* or any other United States Supreme Court case.

It is very easy from this standpoint, after many years, for a single United States district judge to criticize an experienced and able state court prosecutor and certainly to criticize the distinguished members of the Supreme Court of Indiana. The Supreme Court of the United States strongly admonishes that such criticism should be measured with great restraint and without any possible rancor. Such is the case here. With all deference, this Court cannot conceive that in a state death penalty case, these prosecutorial comments do not transgress the boundaries established in *Doyle, Griffin,* and *Carter.* As Justice Sutherland said in *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), a federal prosecutor "may strike hard blows, [but] he is not at liberty to strike foul ones." The same constraints are on state prosecutors.

The reality is that a death penalty case, whether in state or federal court, is different. For example, it is mandatory under state law that any conviction that involves the death penalty be automatically appealed to the Supreme Court of Indiana. It is also mandatory that only lawyers that have been death penalty qualified under the rules of the Supreme Court of Indiana are permitted to represent defendants where the death penalty is an issue. There are a multitude of other differences that set death penalty cases in a separate category and treat them differently and more carefully. Current federal death penalty prosecutions likewise have elaborate special treatment. A wise and experienced prosecutor should not have taken the risk that this prosecutor took in the trial of this death penalty case knowing the constraints of the Supreme Court of the United States with regard to the analysis in *Doyle, Griffin* and *Carter.* These are all relatively old cases that have been established doctrine in the Supreme Court of the United States for roughly a quarter of a century. It is with the greatest reluctance in the sense of great restraint that this Judge is compelled by this record to find that the basic constitutional values enunciated in *Doyle, Griffin,* and *Carter* were violated by the prosecutor in this case.

### D.

■ In reviewing a *Doyle* violation, the United States Supreme Court defined the test for harmless error in a habeas case.

The test ... is whether the error had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice.

*Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)

(citations and quotation marks omitted). This Court has exceeding difficulty in finding these comments to be harmless error. The Supreme Court of Indiana found that "[e]ven had such comments been in error, they would have been harmless error." *Ben–Yisrayl v. State,* 690 N.E.2d 1141, 1149 n. 18 (Ind.1997). Earlier in the opinion, the court explained why it was harmless error.

> First and foremost, the jury was presented with the defendant's voluntary confession to police. The State also presented testimony that, prior to his arrest, the defendant admitted to an acquaintance that he had committed the murders. The defendant acknowledged his possession of a .12 gauge sawed-off shotgun, which was identified as the same weapon used to commit the murders. Several witnesses testified to seeing the shotgun in the defendant's possession. The shotgun was found in a closet in the bedroom which was previously occupied by the defendant. Three other witnesses testified they saw the defendant or his car either at the murder scene or in close proximity thereto.

*Ben–Yisrayl v. State,* 690 N.E.2d 1141, 1147–48 (Ind.1997).

Normally, a confession would be an important part of determining harmless error. But here, the prosecutor's comments called on the defendant to explain those very confessions. In so doing, he placed them in question and undermined their ability to form the basis of a finding of harmless error. Using the confessions in the harmless error analysis would allow the state to benefit from having unconstitutionally bolstered the credibility of the very evidence they then use to say that their case was overwhelming. Such an analysis would make it impossible to find error when a prosecutor violated the Fifth Amendment when commenting on a defendant's confession. This cannot be.

A .12 gauge shotgun was found in the defendant's closet and several witnesses testified that they saw the defendant with the shotgun. If that shotgun had been identified as the same one used to commit the murders for which he was being tried in this case, it would be substantial evidence of his guilt; but that was not the evidence presented in this case (T.R. at 4534–35). Kevin A. Judge testified that ballistics tests proved that the defendant's shotgun fired a shell casing recovered at a different murder scene (T.R. at 4521–23) [7] and he testified that all of the shotgun shell fragments recovered from all of the murder scenes (charged and uncharged) contained number 8 shot (T.R. at 4500) with pink Winchester .12 gauge power piston wadding (T.R. at 4492–94). Using this evidence to reach the conclusion that this defendant committed this crime requires concluding that because the ammunition at the murder scenes was similar, the owner of the gun that fired a shell casing found at the other murder scene must have been the shooter at these murders. While it is not unreasonable to discern a relevant pattern from the evidence presented, it is not overwhelming evidence that this defendant committed this crime. The similarity of the ammunition does not prove that the shooter at all of the murder scenes was the same person.

The Supreme Court of Indiana notes that three witnesses testified that they saw the defendant or his car in proximity to the murder scenes. After reviewing the testimony of all of the witnesses, this court believes that it has identified the three witnesses to which they were referring. Barbara Wright testified that she saw the defendant and a similar looking car in the parking lot of the Hobart Federal Bank on

---

**7.** Jerry L. Gauthier also presented the same testimony (T.R. at 4606).

Thursday, December 13, 1990, at approximately 6:15 p .m. (T.R. at 2165–67). The Hudson Gas Station murder occurred on that day around that time. The bank is about 1.25 miles from the murder scene (T.R. at 2184). Glenn Kerns testified that he saw the defendant's car in the space where he usually parked his truck at the Howard Johnson's on December 14, 1990, the day before the murder there (T.R. at 2543–44). Bob Bailey testified that the defendant tried to enter the locked door at the Hudson Gas Station on December 15, 1990, two days after the murder there and the same day as the murder at the Howard Johnson's (T.R. at 2635). None of these witness linked the defendant directly to either of the murders at issue in this trial.

The evidence is that a shotgun was used in the charged murders. The defendant owned a shotgun which fired a shell casing found at the scene of another murder. The ammunition used in the charged murders was similar to the type used at the other murder. The defendant was in the general area of the charged murders. This evidence is not overwhelming. To conclude otherwise is either an unreasonable determination of the facts or an unreasonable application of the law, or both. Only the confession presents the kind of strong evidence necessary to find the Constitutional error harmless, but, as previously explained, it would be inappropriate to use the confession as the basis of a harmless error determination in this case.

### E.

The statement made by the prosecutor during closing argument was a violation of *Doyle, Griffin* and *Carter*. Since the evidence against him cannot be found to be overwhelming, the petitioner has demonstrated actual prejudice.

### II. INACCURATE AND UNRELIABLE TRAIL TRANSCRIPT

■ The other issue in this case has to do with the state trial court record which is an unusual issue to be reviewed here in this species of cases under 28 U.S.C. § 2254. For those who have labored long in the trial courts of the state and federal judiciary are acutely aware of the critical importance that court reporters play in trials of this sort. It can be very easy to be critical of state court trial judges whose tasks in death penalty cases are onerous in the extreme. It is also a part of reality that state court trial judges sometimes do not have the luxury of multiple court reporters even in cases involving the death penalty. However, it is also apparent from the record that the signals were clear that the original court reporter was having serious and highly relevant emotional problems going into this case. Those problems are at the heart of the effort made by the Supreme Court of Indiana, by the prosecutor, and indeed at some points by defense counsel in trying. to patch together a valid record. This Court knows well that the perfect can be the enemy of the good. No one can read the opinions of the Supreme Court of Indiana and this record and not believe in the complete good faith of all involved to patch together a valid record. But the plain fact is that in spite of those efforts, this record can not be labeled good. As a matter of fundamental due process under the Fourteenth Amendment of the Constitution of the United States, this record simply is not good enough to sustain a state court death penalty conviction. *See Dobbs v. Zant*, 506 U.S. 357, 358, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993) ("We have emphasized before the importance of reviewing capital sentences on a complete record.") The record before this court is far too slender a reed. The Court reaches this conclusion with the

greatest of reluctance, and with a profound respect for the state trial court, prosecutor, and defense lawyers involved.

The parties have cited and debated various errors in the record many times before, and it would be of no benefit for this court to reprint a list of these lists. Rather, a single example can serve to illustrate both the importance of an accurate record and the uncertainty in this one. The first issue addressed by this court, the prosecutorial comments during closing argument, required the court to analyze the exact words the prosecutor said to the jury. The difference of a word or two is the difference between zealous advocacy and Constitutional error.

Yet an examination of the record demonstrates that the very pages of the transcript which contain that portion of the prosecutor's closing argument are different than the other pages. Most of the pages of the trial transcript appear to be originals on the same type of paper with perforated edges. Pages 5522–5549 are examples of this type of page. These pages have two page numbers: the trial transcript page number and the trial record (Bates) page numbers. An examination of pages 5550–5570 shows that they are different. They look like copies, they do not have perforated edges, and they have three pages numbers. The third page numbers are obliterated with a black marker, but it is still possible to read that they are numbered from 2 through 22. It is on one of these different pages, 5563, that the prosecutor's unconstitutional comments to the jury are transcribed.

The goal of the verbatim transcript is to get down on paper every word spoken during trial as accurately as possible. Often there are keen verbalizations that are important in form and content. Important verbal nuances are often present. Such is clearly evident from the recent Supreme Court opinion in *Wiggins*. Attempts to create a record, as here, by either an impaired court reporter or by other court reporters based on an impaired court reporter's notes are uncertain to fully expose these important nuances.

Even though this court is comfortable granting the Writ based on the prosecutor's comments, there remain uncertainties in this record as to what was said. If the prosecutor's words were changed only slightly in the transcription due to the verifiable impairment of the court reporter, then no reviewing court would be able to determine what was actually said. Under such a circumstance, the Constitutional violation could have been either more severe than the transcription demonstrates or there may have been no Constitutional violation at all. This transcript contains too many errors and uncertainties for this court to use it as the basis for the life and death decision presented in this case and this court will not countenance the execution of the petitioner based on this record.

A carefully prepared, competent transcript—with integrity—is a confluence of events. It starts in the live process with the reporter's sensory skills: the ability to hear, see and concentrate. It continues with accurate notes and finishes with the interpreted transcription of those notes to produce a written record of the spoken word. All of these steps are in doubt in this case. The impairment of the court reporter calls into question the accuracy of her sensory perception and the accuracy of her notes. Despite the dedicated efforts of other court reporters to reconstruct this record, this court does not have confidence that their skills, no matter how great, could compensate for inaccurate, inadequate or absent notes. The more complicated and nuanced the proceeding is, the more important the need for good notes. Death penalty cases are invariably complicated and nuanced. This prosecutor's

closing argument is an excellent example of this dilemma, and it is a dilemma which must be resolved in favor of the petitioner.

## III. CONCLUSION

For the foregoing reasons, the court now **GRANTS** the petition with respect to Claims One and Two. The court does not address any of the other claims presented by the petitioner. The Great Writ is now **GRANTED** conditioned upon the release or retrial of the petitioner within 120 days.

**IT IS SO ORDERED.**