Frank **MIDDLETON**, Jr., Petitioner,

v.

Parker **EVATT**, Commissioner, South Carolina Department of Corrections and Travis Medlock, Attorney General, State of South Carolina, Respondents.

Civ. A. No. 3:92–0944–8AJ.

United States District Court, D. South Carolina, Columbia Division.

June 16, 1994.

---

ORDER

BLATT, Senior District Judge.

This habeas corpus action is before the court by the petitioner who is seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. The petitioner, Frank Middleton, Jr., is a South Carolina prisoner who has been sentenced to death. The petitioner was indicted at the December, 1984, term of General Sessions Court for Charleston County for the June 10, 1984, murder of Shirley Mae Mack, for criminal sexual conduct in the first degree, and for armed robbery. The State sought the death penalty in this case and in a companion case tried at the same time, involving the murder of Janell Garner, which occurred on June 9, 1984. The petitioner was found guilty on February 4, 1985, of all charges, and he was sentenced to death for murder, thirty (30) years consecutive for criminal sexual conduct, and twenty-five (25) years consecutive for armed robbery. An appeal was taken to the Supreme Court of South Carolina. The Court reversed these convictions and sentences and remanded for a new trial. On remand the two cases were severed.[1] *State v. Middleton*, 288 S.C. 21, 339 S.E.2d 692 (1986).

The retrial involving the murder of Shirley Mae Mack began on November 17, 1986. The State again sought the death penalty and the petitioner was convicted of murder, criminal sexual conduct in the first degree, and armed robbery. In the bifurcated sentencing proceeding, the trial jury found the existence of the following statutory aggravating circumstances, pursuant to S.C.Code § 16–3–20:

a. Murder was committed while in the commission of armed robbery.

b. Murder was committed while in the commission of criminal-sexual conduct.

On November 24, 1986, after the jury unanimously recommended the death penalty, the petitioner was sentenced to death.

A. Hoyt Rowell, III, Charleston, SC, David I. Bruck, Columbia, SC, for petitioner.

Donald J. Zelenka, Columbia, SC, for respondents.

1. At the November 5, 1993, hearing held by this court, the respondent's attorney, Mr. Zelenka, asked Mr. Kent, the public defender who represented the petitioner in the Mack case, whether he had access to the defense counsel's file employed in petitioner's first trial. Mr. Kent responded that he had access to the file. Mr. Zelenka obviously was trying to show that having access to this file would greatly assist Mr. Kent in handling the retrial of the murder of Ms. Mack.

The petitioner was represented at this trial by Joseph F. Kent, Charleston County Public Defender, James A. Stuckey, Jr., court appointed private practitioner, and Kathryn K. Andrews, Assistant Public Defender for Charleston County.[2] The petitioner appealed to the South Carolina Supreme Court. On February 22, 1987, the South Carolina Supreme Court affirmed the judgment of conviction and sentence of death. *State v. Middleton,* 295 S.C. 318, 368 S.E.2d 457 (1988). The petitioner filed for a rehearing on certain issues, and on May 25, 1988, the South Carolina Supreme Court denied the petition for rehearing.

On July 22, 1988, the petitioner filed a petition for certiorari in the United States Supreme Court which was denied on October 3, 1988. *Frank Middleton v. South Carolina,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988). On October 12, 1988, the petitioner filed a petition for rehearing based on the grant of certiorari on June 26, 1989, in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), and he filed an application for suspension of the order denying certiorari. On October 19, 1988, the Court denied the application to suspend and on November 14, 1988, the Court denied the petition for rehearing. *Middleton v. South Carolina,* 488 U.S. 961, 109 S.Ct. 406, 102 L.Ed.2d 393 (1988).

The petitioner then filed for post-conviction relief in the state court. On June 19, 1989, Judge Walter Bristow held a hearing on the state post-conviction relief petition.

On October 28, 1989, Judge Bristow issued an order denying the petition in its entirety.[3] On September 10, 1990, petitioner filed a Petition for Writ of Certiorari in the Supreme Court of South Carolina appealing Judge Bristow's order. The South Carolina Supreme Court denied the petition on March 7, 1991, by letter order. On June 5, 1991, petitioner filed a Petition for Writ of Certiorari in the United States Supreme Court. The United States Supreme Court denied this petition on October 7, 1991. *Middleton v. S.C.,* —— U.S. ——, 112 S.Ct. 163, 116 L.Ed.2d 128 (1991). On April 2, 1992, petitioner filed his federal petition for Writ of Habeas Corpus, which is currently before this court. On May 18, 1992, the State filed a motion for summary judgment and the petitioner filed opposition to the motion. The record includes the report and recommendation of United States Magistrate Judge Robert S. Carr, in which report he recommends that the respondents' motion for summary judgment be granted and that the petition for habeas corpus be dismissed. The parties were given notice of the right to file objections to the report and recommendation, and of the consequences for a failure to do so; in response, the petitioner filed objections with this court. This court heard oral arguments on the issues involved herein on October 28, 1993. Petitioner had submitted an affidavit by Joseph Kent, dated October 14, 1993, in which he describes his performance at trial. This court found it necessary to hold a second hearing on November 5,

---

**2.** The petitioner points out that in the Janell Garner murder case, in which he was thereafter represented by different private counsel before a different jury, he received a sentence of life imprisonment rather than death. Petitioner also contends that, because the state was permitted to introduce evidence concerning the Garner murder at the Mack sentencing hearing, and vice versa, both juries sentenced petitioner after being fully apprised of the details surrounding the circumstances of both murders. Petitioner further asserts that the circumstances surrounding both murders were very similar; thus, petitioner argues that the differences in sentences imposed cannot be explained by any differences between the facts of the Garner and Mack murders. The court notes that the petitioner was represented by Mr. Kent, Ms. Andrews and John T. Taylor, a private practitioner, in the Janell Garner murder trial. The petitioner has submitted the transcript of the retrial of the Janell Garner trial and this

court has reviewed it. Although it is a helpful analytical tool, this court realizes that there was a different jury involved which could have been the reason for the different result. In other words, the fact that different results were reached by different juries in trials based on similar facts does not create an automatic presumption that trial counsel rendered ineffective assistance in the trial which resulted in the less desirable result.

**3.** Judge Bristow's order is included in Volume VI of the transcripts submitted by petitioner, at page 2912. The petitioner submitted six volumes of documents, including the 1986 trial transcript. Throughout the remainder of this order, cites will be to a volume and page number, with the understanding that the cite refers to the six volumes submitted by petitioner.

1993, in order to allow the Mr. Kent to be cross-examined as to his affidavit and to elicit further testimony concerning the alleged errors at trial.[4]

The report and recommendation of the United States Magistrate Judge was made in accordance with 28 U.S.C. § 636 and the local rules of this district concerning reference to a Magistrate Judge. *See United States Magistrates,* Local Rule 19, D.S.C.; *Social Security Cases,* Local Rule 20, D.S.C.; *Bowman v. Bordenkircher,* 522 F.2d 209 (4th Cir.1975). Under 28 U.S.C. § 636(b),

> [a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The judge may also receive further evidence or recommit the matter to the Magistrate Judge with instructions.

Here, the petitioner filed objections to the Magistrate Judge's report and the court has conducted a *de novo* review of those parts of the Magistrate Judge's report to which objections were received.

▪ Petitioner's first objection concerns his ineffective assistance of counsel claim in connection with the determination of his sentence in his 1986 capital trial, which was the retrial for the murder of Ms. Mack. Specifically, the petitioner argues that the Magistrate Judge misapplied § 2254(d)'s factual presumption of correctness to the legal questions of attorney competence and practice. The Magistrate Judge held that this court is bound by the factual findings made by the state court, after a full and fair hearing, that the alleged deficiencies were trial tactics. In *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984), the Supreme Court stated:

... [I]n a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. 2254(d). Ineffectiveness is not a question of "basic, primary, or historical fact,".... Rather, like the question whether multiple representation in a particular case gave rise to a conflict of interest, it is a mixed question of law and fact....

In *Cave v. Singletary,* 971 F.2d 1513, 1518 (11th Cir.1992), the Eleventh Circuit found that the question of whether a trial decision was tactical is a question of fact; however, whether the tactic was reasonable is a question of law. Therefore, while this court is bound by the state court's determination that the alleged deficiencies were trial tactics, it still must undertake its own review of whether the trial tactics were reasonable.

▪ As stated in the Magistrate Judge's report and recommendation, an analysis of a claim of ineffective assistance of counsel must begin with the standard set forth in *Strickland,* supra. To be successful on his claim, petitioner must demonstrate first that Mr. Kent's performance was deficient because it fell below an objective standard of reasonableness. *Strickland,* 466 U.S. at 687–91, 104 S.Ct. at 2064–67. There is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. The reviewing court must be highly deferential in scrutinizing counsel's performance and must filter from its analysis distorting effects of hindsight. *Strickland,* 466 U.S. at 688–89, 104 S.Ct. at 2064–65. Second, petitioner must prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104

---

**4.** In his affidavit, dated October 14, 1994, Mr. Kent admits that the *Middleton* defense was presented in a disjointed and ineffectual manner. Even though this court considered Mr. Kent's affidavit in its analysis, it was not given substan-

tial weight because ineffectiveness is a question which the court must decide; thus admissions of deficient performance by attorneys are not decisive. *Atkins v. Singletary,* 965 F.2d 952 (11th

S.Ct. at 2068.[5] The Magistrate Judge also correctly stated that an inquiry into whether counsel's performance was deficient may begin with an inquiry of either prong of *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069–70.

The petitioner also objects to the Magistrate Judge's description of the "thrust" of petitioner's claim. The Magistrate Judge felt that the thrust of petitioner's claim is that his appointed counsel, Joseph Kent, the Public Defender for Charleston County at the time of the trial, was a minimally functioning alcoholic, who was unable to properly prepare or execute his defense. The petitioner argues that the thrust of his claim is that Mr. Kent's actual performance at trial was marred by a series of grave errors and omissions. These specific allegations are summarized as follows:

(1) Counsel's impulsive and unplanned suggestion in his opening statement that the state would fail to prove that petitioner killed the victim; and

(2) Counsel's inexplicable decision to attack the husband of the murder victim on cross-examination, implying that his marriage to the victim had been unstable, and that he lacked concern for her safety and welfare, and that the victim abused alcohol; and

(3) Counsel's presentation of poorly-prepared mental health experts with conflicting and, in one case, indefensible opinions on the issue of criminal responsibility; and

(4) Counsel's failure to utilize readily available evidence to challenge the only expert testimony casting doubt on petitioner's mental retardation; and

(5) Counsel's trivializing of petitioner's mental retardation in his closing argument, which failed to explain mental retardation but instead simply characterized petitioner as "dumb"; and

(6) Counsel's failure to request instructions on the jury's actual responsibility for imposing sentence, and on the nature of the sentencing decision; and

(7) Counsel's poorly-organized pretrial preparation, which resulted in what was, in fact, a compelling set of mitigating circumstances being presented to the jury in a truncated and unpersuasive manner.

Since this court has decided that it must review each alleged error to determine whether it was a reasonable trial tactic, the concerns that the petitioner has that the actual thrust of his claim was not addressed will be resolved by this order.

Upon an exhaustive review of the record and of the in-depth testimony given by Mr. Kent as to each alleged error at the November 5, 1993, hearing, this court is convinced that Mr. Kent rendered effective assistance to the petitioner because the alleged errors, which were found to be trial tactics by the state post-conviction relief judge, were reasonable and/or not prejudicial in the sentencing phase of the trial.[6]

### First Alleged Error

■ The first alleged error is Mr. Kent's impulsive and unplanned suggestion in his opening statement that the state would fail to prove that petitioner killed the victim. The petitioner argues that prior to trial Mr. Kent and Ms. Andrews had agreed that Kent's opening statement would attempt to establish counsel's credibility by admitting that petitioner had killed Ms. Mack, and to explain petitioner's mental defenses in such a way as to focus the jury's attention on those issues rather than on the undeniable brutality of the crimes to which petitioner had confessed.

Cir.1992) citing *Harris v. Dugger*, 874 F.2d 756, 761 n. 4 (11th Cir.1989).

**5.** Petitioner is only seeking a retrial of the penalty phase of his trial as to the ineffective assistance of counsel claim.

**6.** The petitioner, in Footnote 4, at page 10 of his objections, states that any assessment of the adequacy of petitioner's representation must center almost entirely on Mr. Kent's performance, since the undisputed evidence is that co-counsel Stuckey played only a minimal role. The remaining member of petitioner's trial defense team was Kathryn Andrews, who was an assistant public defender at the time of trial. This court agrees that the *Strickland* analysis should focus basically on Mr. Kent's performance.

The state post-conviction relief judge, in his order dated October 28, 1989, stated: "In his opening statement, counsel left open the reasonable doubt of his client's guilt by asserting the state would have to present evidence to convince them beyond a reasonable doubt of his guilt. The defense team presented a legal argument under the *corpus delicti* theory that it hoped would remove the confession and a significant piece of the state's evidence. This theory was pursued throughout the appellate process without success. Now, applicant contends that this approach was a major strategic error that deprived him of a fair trial. It is difficult to see the prejudice in the *outcome* of the case where the issue was to concede guilt or not. The mere fact that guilt was not conceded and it was suggested that the state would have to meet its burden of proof does *not* meet the prejudice prong under *Strickland.*" See Volume VI, p. 2930.

The petitioner's memorandum on the *corpus delicti* theory is found in Volume III, p. 1623, of the record. In this memorandum at Volume III, p. 1624, Mr. Stuckey states:

Dr. Conradi, the Medical Examiner, listed the "probable cause of death" as "Asphyxia due to strangulation of suffocation" however Dr. Conradi admits that this cause of death was based on the information in defendant's confession given on June 15th and not on her autopsy findings.

Based on the defense's interviews with Dr. Conradi we believe that if the confession is not considered, as it cannot be if the State cannot prove the *corpus delicti* independent of it, Dr. Conradi can only testify based on her findings and the physical evidence and her determination will then be: "the cause of death is *undetermined* with asphyxia a primary *possibility.*"

Apparently, petitioner's attorney was trying to suppress the confession by arguing that the state would not be able to prove the *corpus delicti* of either the rape or murder charges by facts independent of the confes-

sion. At the November 5, 1993, hearing held by this court, Mr. Kent was further questioned about the *corpus delicti* argument. Although Mr. Kent described his opening statement as a "blunder", he explained that his co-counsel, Mr. Stuckey, thought of the *corpus delicti* argument during jury voir dire. Mr. Kent also testified that at the time of his opening statement, defense counsel had argued a motion to suppress the confession, but the trial judge had not yet decided the motion.

At the state post-conviction hearing, Volume V, p. 2635, Mr. Kent testified that Mr. Stuckey's strong conviction about the validity of the *corpus delicti* argument caused him to include it in his opening statement and that this argument did detract from his opening statement. This court interprets this testimony to mean that Mr. Kent made a tactical decision to leave the question of petitioner's guilt open because he thought that some, or all, of the confession may be suppressed later during trial.

Based on the foregoing argument, this court does not think it was unreasonable for Mr. Kent not to concede guilt from the outset of the trial when he thought there was a chance that the state's evidence might not be so strong, or that part, or all, of the confession might be suppressed if his *corpus delicti* argument was successful. Thus, as to the first alleged error, this court finds that Mr. Kent's performance did not fall below an objective standard of reasonableness.

In the alternative, if a higher court later determines that Mr. Kent's performance fell below an objective standard of reasonableness, this court will determine whether the prejudice prong of *Strickland* is met. "When a defendant challenges a death sentence ... the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." [7]

7. In South Carolina, the sentencing jury should not be instructed to "weigh" the aggravating circumstances against the mitigating circumstances; rather, the jury should be instructed to

"consider" any mitigating circumstances as well as any aggravating circumstances. The petitioner, in his appeal to the South Carolina Supreme Court, complained that the trial judge improper-

*Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068–69. In making this determination:

> [A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. *Strickland* at 696, 104 S.Ct. at 2069.

This court cannot say that there is a probability sufficient to undermine the confidence in the outcome because guilt was not conceded from the outset. Petitioner argues that Mr. Kent's credibility with the jury was damaged because he did not concede guilt. Even if guilt had been conceded during the guilt phase, this court feels that the evidence presented during the sentencing phase would have been the same. While it is conceivable that some jurors would find it more credible to concede guilt from the outset, this court cannot find with any reasonable probability that the outcome of the sentencing would have been different. After a thorough review of the record, this court finds that the jury's recommendation of the death sentence was *overwhelmingly* supported by the evidence of the heinous nature of the crime. While a reasonable case for mitigation was presented, there was strong evidence upon which the jury could consider and impose the death penalty. This court finds that the decision to concede guilt from the outset did not have a pervasive effect on the inferences to be drawn from the evidence that would alter the entire evidentiary picture; thus, petitioner has failed to meet his burden of showing that the decision reached would reasonably likely have been different absent the alleged errors.

### Second Alleged Error

■ The second alleged error is Mr. Kent's inexplicable decision to attack the husband of the murder victim on cross-examination, implying that his marriage to the victim had been unstable, and that he lacked concern for her safety and welfare, and that the victim abused alcohol. In his response to the state's motion for summary judgment at p. 22, petitioner states that Mr. Kent explained that his decision to attack the victim's husband was an effort to "bait" the solicitor into committing reversible error ... "to draw Mr. Condon [the solicitor] into ... prejudicial and inappropriate comments and references to family and victims and so forth."

At the November 5, 1993, hearing held by this court, Mr. Kent admitted that he was

---

ly charged the jury to "weigh" the aggravating and mitigating circumstances in rendering its decision in the sentencing phase. *State v. Middleton,* 295 S.C. 318, 368 S.E.2d 457 (1988). In response to petitioner's argument, the South Carolina Supreme Court held that the charge was not erroneous. The Court noted that, although it had recently instructed the trial bench not to charge the jury to weigh the aggravating and mitigating circumstances in *State v. Bellamy,* 293 S.C. 103, 359 S.E.2d 63 (1987), the petitioner's case was tried before *Bellamy.* The court also noted that the trial judge twice used the word "weigh" in his instruction; however, since he also clearly instructed the jury that it could consider any factor in mitigation and could recommend a life sentence for no reason at all, the Court found that the charge was not erroneous. Since the South Carolina Supreme Court ruled that using the word "weigh" was not improper for the aforementioned reasons, and since that alleged error is not a ground for relief sought herein, this court has modified its application of *Strickland* to the facts at hand in that when it reviewed the aggravating and mitigating circumstances, it did not "reweigh" the circumstances, but it "considered" them, just as a jury in South Carolina would be instructed to do. However, as another alternate holding this court does find that there was ample evidence to determine that the aggravating circumstances outweighed the mitigating circumstances in each of the errors alleging ineffectiveness of counsel.

trying to lure Mr. Condon into overstepping the bounds of victim sympathy. Mr. Kent explained in his testimony before the state post-conviction relief judge, Volume V, beginning at p. 2738, that his prior experiences with Mr. Condon had been that Mr. Condon was extravagant in his dependence upon the sympathy and emotion of juries for victims and victims' families. Mr. Kent further explained that he had already had two experiences with Mr. Condon in other death cases and he believed that sooner or later, perhaps in this case, Mr. Condon was going to cross the line and go too far in these appeals to the sympathy of the jury. Petitioner points out that Mr. Kent, on the other hand, testified that he understood that the South Carolina Supreme Court would probably not reverse a death sentence based on a solicitor's comments concerning evidence that defense counsel adduced at trial. Further, petitioner argues that Mr. Kent acknowledged that his attack on the victim's husband had apparently backfired, as it provided Mr. Condon with the ammunition for a very effective closing argument. Volume V, p. 2742–2743. In addition, Mr. Kent acknowledged at the November 5, 1993, hearing held by this court that he had opened the door to sympathy testimony.

The state post-conviction relief judge determined that, while Mr. Kent's examination of the victim's husband did not uncover useful information to the defense, the prejudice prong was not met. "A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland* 466 U.S. at 697, 104 S.Ct. at 2069–70. This court finds that it is easier to dispose of this claim by determining whether the prejudice prong has been met.

The state argues that the petitioner received the death penalty because of the brutal crime he committed, not because his counsel asked the victim's husband in the *guilt* phase some questions probing the question of when the husband realized that his wife was missing. See Respondent's Motion for Summary Judgment p. 18 citing *Fitzgerald v. Thompson,* 943 F.2d 463 (4th Cir.1991) ("it was for the vileness of the crime that Fitzgerald received the death penalty"). This court recognizes that Mr. Kent did more than just ask the victim's husband questions about when he discovered that his wife was missing. Petitioner once again argues that Mr. Kent's cross-examination of the victim's husband in this manner lessened his credibility with the jury. However, once again for the same reasons expressed heretofore, this court cannot say that, but for counsel's cross-examination of the victim's husband in the guilt phase, the outcome of the sentencing phase would have been different. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test." *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067–68.

### Third Alleged Error

■ The third alleged error is counsel's presentation of poorly-prepared mental health experts with conflicting and, in one case, indefensible opinions on the issue of criminal responsibility. Petitioner argues that Mr. Kent's credibility was destroyed when he did not keep the promise made in his opening statement that petitioner's defense, if he committed the crime, would be "mental disease or insanity" and, further, that the "consensus among all the doctors" would be that petitioner suffered from "mental disease or insanity" at the time of the crime. Petitioner argues that the five expert witnesses presented to support petitioner's defenses of insanity and guilty, but mentally ill, differed widely among themselves as to petitioner's diagnoses and whether petitioner was entitled to either of these defenses. At p. 29 of petitioner's response to the motion for summary judgment, he outlines the mental health testimony as follows:

1. Dr. Greer stated that petitioner was, in effect, neither insane nor guilty but mentally ill.

2. Dr. Morgan found petitioner not to be insane, and probably not guilty but mentally ill.

3. Dr. Outz found petitioner to be not insane but guilty but mentally ill, although he had difficulty stating the latter conclusion in the presence of the jury.

4. Dr. Mossman found petitioner to be legally insane, despite the absence of psychosis at the time of the offense.

5. Dr. Kimbrell had no opinion on petitioner's criminal responsibility.

Petitioner argues that the most discordant of the mental health experts was Dr. Mossman. Dr. Mossman was the only expert to find that the petitioner was insane. The state post-conviction judge found:

> ... [I]t is a reasonable strategy to investigate and present expert witnesses in the mental health area who agreed as to the existence of a mental illness but varied on its effect. Because Dr. Mossman's professional opinion in the area of sanity varied in degree from the others did not make counsel's performance deficient. This was clearly a strategic move that should not be second-guessed by the court.... Counsel's decision to pursue and present this testimony that presented stronger evidence of mitigation in concert with other mental mitigation testimony did not meet the "prejudice" prong of *Strickland.* See Volume 6, p. 2931.

This court agrees with the view of the state post-conviction relief judge. The petitioner argues that the state post-conviction relief court did not address petitioner's actual claim of prejudice which was based on the

impact on the jury's sentencing decision of such an incoherent succession of psychiatric opinions. The respondents argue that Mr. Kent's decision to present the most favorable opinion of insanity, when each mental health expert agreed as to the existence of a mental illness or defect, was a strategic move. Furthermore, respondents argue that Mr. Kent's decision to pursue and present this testimony of the stronger evidence in mitigation in concert with other mental health experts does not meet the "prejudice" prong of *Strickland,* and the argument that petitioner was actually *less* mentally ill than asserted would have caused *this* jury to impose a more lenient sentence is unfounded speculation. This court agrees with the respondents' arguments and finds that the decision to present Dr. Mossman was a reasonable trial strategy. Further, this court cannot find that there is reasonable probability that had Dr. Mossman not testified the result of the sentencing would have been different.[8] The jury would have been presented with testimony that petitioner was less mentally ill and, therefore, there is not a reasonable probability that the jury would have imposed a lesser penalty; it is more logical to find that a jury would have imposed a greater penalty under such a scenario.[9]

### Fourth Alleged Error

■ The Fourth alleged error is counsel's failure to utilize readily available evidence to challenge the only expert testimony casting doubt on petitioner's mental retardation. The state presented Dr. John Dunlap who gave his opinion that petitioner had received

8. This court notes that it agrees with petitioner's argument that the "prejudice" prong analysis should focus on the effect that the alleged errors may have had on the eventual sentencing and not on petitioner's guilt or innocence. This court also finds that the state post-conviction relief judge did determine the effect on the eventual sentencing because in his order he refers to mitigation which is only relevant as to whether to impose the death penalty.

9. A component of petitioner's ineffective assistance of counsel claim is that Dr. Mossman was inexperienced and not qualified to testify. In Volume III, at p. 1151, Dr. Mossman was offered as an expert witness. The solicitor, Mr. Condon, questioned Dr. Mossman as to why he had not

yet taken the certification boards required by his profession. Dr. Mossman gave an explanation which apparently satisfied the solicitor because he did not object to Dr. Mossman's qualification as an expert witness. Apparently, the solicitor had a concern that Dr. Mossman had only completed his residency 4½ months prior to the trial. Mr. Condon's questions showed that Dr. Mossman had just completed three years of regular residency and 2 years of specialized fellowship training for a total of five years of training. He also indicated that the Medical University of South Carolina had hired him as a faculty member despite the fact he had not yet taken his certification boards. These facts tend to show that Dr. Mossman was competent to testify.

IQ scores between 62 and 80, that his IQ was probably closer to 80 than 62, and that petitioner's vocabulary was too sophisticated for a mentally retarded person. See Volume III, pp. 1239–40. Petitioner alleges that Mr. Kent should have discredited Dr. Dunlap's testimony on cross-examination by showing that the test scores that Dr. Dunlap employed were invalid because of a theory dubbed "the practice effect." Petitioner argues that the only two tests to yield scores above the mentally retarded range were administered within six months of prior IQ tests, and were therefore likely to reflect the so-called "practice effect", which allegedly produces artificially elevated scores.

At the October 28, 1993, hearing held by this court, respondent pointed out that the "practice effect" was addressed by petitioner's expert, Dr. Greer, during cross-examination by the solicitor. This court has reviewed that testimony. In sum, Dr. Greer stated that the test which produced a full scale IQ of 80, was invalid because it was given within six months of the other test. Dr. Greer further explained that her opinion was based on the "practice effect" theory which she explained. Although Dr. Greer did not state that these were the tests that Dr. Dunlap employed, this court is assuming that these were the same tests on which Dr. Dunlap relied, because he was the only expert whose testimony involved the score of 80 on such a test. See Volume II, at p. 1114–15. Therefore, petitioner cannot reasonably argue that he was prejudiced by Mr. Kent's failure to cross-examine Dr. Dunlap as to this "practice effect", when such fact was revealed during the cross-examination of petitioner's expert witness. This error is more appropriately analyzed under the prejudice prong.[10] The jury was adequately exposed to the "practice effect" theory regarding the tests employed by Dr. Dunlap, and this court finds that there is no reasonable probability that the outcome of the sentencing would have been different since the jury would not have been presented with any different information. Therefore, the petitioner does not meet the prejudice prong as to this alleged error.

## Fifth Alleged Error ·

■ The fifth alleged error is petitioner's counsel's trivializing petitioner's mental retardation in his closing argument, in which argument counsel failed to explain mental retardation but, instead, simply characterized petitioner as "dumb". Mr. Kent made the following statement in his closing argument:

> Now I think what all this comes down to is this. Frank Middleton does not act with sane knowledge and forethought for his actions. He simply does not.
>
> In the first place, we know that he is substantially impaired intellectually. *It's what in everyday talk people say is dumb. That's all. He's dumb.* In the lower two percent which is low.

Petitioner contends that this statement made in the closing argument of the guilt phase prejudiced petitioner in the sentencing phase. If this statement is taken out of context, petitioner may have some tenuous argument. However, this court has reviewed Mr. Kent's closing argument in its entirety and finds that Mr. Kent focused on petitioner's mental state throughout the entire closing argument. This claim is easily disposed of under the prejudice prong of *Strickland.* There is definitely not a reasonable probability that if Mr. Kent had not made this statement in his guilt phase closing argument that the outcome of petitioner's sentencing would have been different.

## Sixth Alleged Error

■ The sixth alleged error is counsel's failure to request instructions on the jury's actual responsibility for imposing sentence, and on the nature of the sentencing decision. Since this court agrees with the Magistrate Judge's recommendation that the trial jury was not misled as to its sentencing responsibilities, this court finds that Mr. Kent's conduct on this issue was not deficient.

10. The state post-conviction relief judge held that this alleged error was a strategic decision by counsel. This court finds it easier to dispose of this claim by employing the second prong of *Strickland,* and therefore does not reach the first prong.

### Seventh Alleged Error

■ The seventh alleged error is counsel's poorly-organized pretrial preparation, which resulted in what was, in fact, a compelling set of mitigating circumstances being presented to the jury in a truncated and unpersuasive manner. Petitioner argues that this court should compare the presentation of the mitigating evidence in petitioner's second retrial, which resulted in a life sentence, to the presentation in this trial. As stated earlier, this court finds that the comparison of the second retrial to the first retrial is a helpful analytical tool, but the comparison does not provide conclusive evidence that the prejudice prong is met as to the first retrial merely because the second retrial resulted in a lesser sentence.

This court has completed an exhaustive review of the presentation of mitigating circumstances in both trials. This court determined that petitioner's claim as to this alleged error focused on the omission of the testimony of Ms. Brenda Wyrick, a DSS protective services worker, in the trial at issue. Ms. Wyrick was called to testify in the retrial of the other case involving the murder of Mrs. Garner, and she presented strong mitigating evidence which this court reviewed in its entirety. This court was at first concerned that Ms. Wyrick's testimony may have produced a different result in the petitioner's sentence of death in the first retrial; therefore, this court undertook a review of all of the mitigating evidence presented in both retrials and finds that substantially the same mitigating factors were presented at both retrials. The difference was that in the second retrial, Ms. Wyrick was able to testify as to petitioner's entire history, while, in the trial at issue here, substantially the same mitigating evidence was presented by a series of witnesses instead of one. Although, it may be ineffective for an attorney not to present certain mitigating factors, this court does not find that it is ineffective for an attorney to call a series of witnesses as opposed to one witness, to present mitigating factors as long as the attorney fulfills his obligation to present the appropriate mitigation testimony. The important fact is that both juries heard substantially the same mitigation testimony, and this court cannot find that, but for counsel's omission of Ms. Wyrick's testimony in the first retrial, petitioner would have received a lesser sentence. This court believes that it was a reasonable trial strategy to call several witnesses instead of one as to the mitigation testimony and, further, that petitioner fails to meet the prejudice prong of *Strickland* on this question.

### Remaining Objections

In addition to his objections as to his ineffectiveness of counsel claim, petitioner filed five remaining objections as to which this court heard oral arguments. Only two of these objections merit further discussion by this court. The first concerns the petitioner's fifth amendment right against self-incrimination. The second objection concerns the reasonable doubt charge given in the guilt phase. The remaining objections are without merit and this court agrees with the Magistrate Judge's analysis as to those objections.

■ First, the petitioner claims that his Fifth Amendment right against compelled self-incrimination was violated by the failure of the trial judge to instruct the jury, at the *sentencing* phase of his trial, that petitioner's failure to testify at the sentencing phase could create no adverse inference against him and could not be considered in aggravation of his punishment. As the Magistrate Judge stated, it is well settled that the trial judge has the obligation to instruct the jury not to draw an adverse inference from the defendant's failure to testify, if requested by the defendant in a timely manner to give such a charge. *Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). In addition, in *Estelle v. Smith*, 451 U.S. 454, 462–63, 101 S.Ct. 1866, 1872–73, 68 L.Ed.2d 359 (1981), the Supreme Court held that a defendant is entitled to the Fifth Amendment protection which is afforded by a no adverse inference charge in the penalty or sentencing phase of a bifurcated trial of a capital case, stating: "We can discern no basis to distinguish between the guilt and penalty phase of respondent's capital murder trial so far as the protection of the Fifth Amendment privi-

lege is concerned." *Id.* at 463, 101 S.Ct. at 1873.

The Magistrate Judge correctly found that there is no obligation to give this instruction without such a request, or without a violation of this right by the prosecution. Thus, the Magistrate Judge found that petitioner's claim was without merit. This court is also convinced that there has been no federal constitutional violation because there were no prosecutorial comments referring to the petitioner's failure to testify, and the petitioner failed to request a no adverse inference charge in the sentencing hearing. Petitioner did request and receive a no adverse inference charge in the guilt phase of his trial.

▮ In his objection, the petitioner argues that the request requirement referred to in *Carter* simply reflects procedural requirements which are almost universally applied by state and federal courts—but which did not have any application here in light of South Carolina's rule of *in favorem vitae* appellate review in capital cases. In *State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315, 323 (1991), the South Carolina Supreme Court prospectively abolished *in favorem vitae* review due to its outdated nature. The doctrine of *in favorem vitae* required appellate courts in South Carolina "to review the entire record for legal error, and assume error when unobjected to, but technically improper arguments, evidence, jury charges, etc. are asserted by the defendant on appeal in a demand for reversal or a new trial." *Torrence* at 59–60, 406 S.E.2d at 324. The Supreme Court has also stated that in pre-*Torrence* cases, under *in favorem vitae*, it reviews the record as if trial counsel had requested a charge and that such request had been denied by the trial judge. *State v. Davis*, 422 S.E.2d 133, 145 at n. 9 (S.C.1992). Thus, the petitioner argues that the South Carolina Supreme Court should have applied *in favorem vitae* review to his case because it is a pre-*Torrence* case. In *State v. Middleton*, 295 S.C. 318, 368 S.E.2d 457, 461 (1988), the South Carolina Supreme Court held:

> Appellant contends the trial judge should have sua sponte instructed the jury in the sentencing phase to draw no adverse inference from appellant's failure to testify.

This court has held that this charge applies to the sentencing phase as well as the guilt phase of a capital trial. *State v. Bellamy,* [293 S.C. 103, 359 S.E.2d 63 (1987) ]; *State v. Arther,* [290 S.C. 291] 350 S.E.2d 187 (1986). It is not reversible error, however, when no such request is made absent other circumstances such as prejudice from the solicitor's reference to the defendant's silence. *State v. Arther,* supra. Here, the solicitor made no reference to the appellant's failure to testify and counsel requested no adverse inference charge. We find the error harmless beyond a reasonable doubt.

Petitioner further argues that since the South Carolina Supreme Court has recognized the applicability of *Carter,* despite the lack of a defense request, a federal court is bound to do the same. The petitioner does not cite any authority for this proposition. This court does not agree that it is obligated to rule on whether the South Carolina Supreme Court should have, or did, apply *in favorem vitae* review. On habeas review, a federal court decides whether petitioner's constitutional right to a fair trial was violated. This court feels that the issue of whether the South Carolina Supreme Court should have, or did, apply *in favorem vitae* review is an issue which should have been decided on direct appeal. Thus, this court finds that *in favorem vitae* does not apply here, and that there was no federal constitutional violation because there were no prosecutorial comments and petitioner did not request the charge.

▮ In the alternative, in the event a higher court later determines that this court is bound to apply *in favorem vitae* review, this court will make an alternative ruling. Under *in favorem vitae* review, this court must presume that petitioner requested a no adverse inference charge and was denied that request by the trial judge. This court finds that under *Carter,* petitioner's Fifth Amendment right against self-incrimination was violated when he was denied such request. The next issue is whether such error is subject to a harmless error analysis.

In *Carter,* 450 U.S. at 303–05, 101 S.Ct. at 1121, although the Supreme Court stated

that it is arguable that a refusal to give a no adverse inference instruction can never be harmless, (relying on *Bruno v. U.S.*, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939)), that Court declined to reach the issue, because it was not presented to, or considered by, the Supreme Court of Kentucky. At least one other circuit has held that the omission of a no adverse inference charge, over proper defense objection, may be found harmless beyond a reasonable doubt. *Richardson v. Lucas*, 741 F.2d 753, 755 (5th Cir.1984). The Fifth Circuit reasoned that since *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) teaches us that prosecutorial comment on a defendant's failure to testify can be harmless error, a similar result is appropriate when a judge erroneously refuses to instruct the jury, following a proper request, not to draw an unfavorable inference from a defendant's refusal to testify. The Fifth Circuit pointed out that prosecutorial comment is even more egregious, and therefore, it could perceive no reason for distinguishing the two types of error insofar as the application of the harmless error doctrine is concerned. *Richardson*, at 755. It is unclear whether the Fourth Circuit would apply a harmless error analysis to the omission of a no adverse inference charge to the situation where a proper request has been made. In an unpublished opinion, the Fourth Circuit reversed a conviction where the trial judge's charge did not pass constitutional muster because of the wording, i.e., it did not state in plain, unequivocal language that the jury could not draw an adverse inference from the defendant's failure to take the stand. The Fourth Circuit did not apply a harmless error analysis to this scenario and this may indicate that it would not apply it to the scenario at hand. *United States v. Wagstaff*, 822 F.2d 56 (4th Cir.1987). If this is the situation, then the petitioner here would be entitled to a retrial on the sentencing phase of his trial because this court, applying the *in favorem vitae* review doctrine, must assume the petitioner made the request for a no adverse inference charge and that the request was denied. In this circumstance, the petitioner's Fifth Amendment right against self-compelled incrimination would have been violated since he was entitled to a no adverse inference charge.

■ Again, in the alternative, if a higher court later determines that this court should have applied a harmless error analysis to the failure to give, under the *in favorem vitae* doctrine, a no adverse inference charge, this court herein conducts such an analysis. In 1993, the Supreme Court held that, on collateral review in habeas, the reviewing court applies the harmless error standard announced in *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946), to determine whether an error of a trial type is harmless. *Brecht v. Abrahamson*, — U.S. —, — – —, 113 S.Ct. 1710, 1721–22, 123 L.Ed.2d 353 (1993). The test under *Kotteakos* is whether the error "had a substantial and injurious effect or influence in determining the jury's verdict." 328 U.S. at 776, 66 S.Ct. at 1253. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice." *Brecht*, — U.S. at —, 113 S.Ct. at 1722.

As stated in footnote two of this order, this case is unusual in that this court has before it the results of two of petitioner's trials for crimes of an equally heinous nature. The first retrial resulted in a death sentence and the second in a life sentence. Therefore, when a harmless error analysis is applied, although not conclusive, this court cannot ignore the result of the second retrial in which petitioner received a no adverse inference charge, and so this court has employed the result of the retrial as an analytical tool. Under *Kotteakos*, the petitioner must show actual prejudice. This court does not find that the petitioner has shown that the failure of the trial judge to have given *sua sponte* a no adverse inference charge in the sentencing phase had substantial and injurious effect or influence in determining the jury's verdict. One basis of a no adverse inference charge argument in the sentencing phase of a capital trial is that, because the trial judge failed to give the charge, the jurors may infer that the defendant does not regret his conduct or that he has no feelings of remorse. This court

finds that any adverse inference the jury may have drawn was basically eliminated when the defendant gave a personal statement to the jury expressing his remorse for the crime. Volume III, p. 1493. Therefore, the court feels that no actual prejudice has been shown by the petitioner.

■ The last objection which merits discussion concerns the reasonable doubt charge given in the guilt phase of the trial. Petitioner objected to the Magistrate Judge's conclusion that his challenge to the trial judge's reasonable doubt instruction is barred by the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The petitioner argued that the reasonable doubt instructions which guided the jury at this trial violated the subsequent decision of *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The Magistrate Judge found that *Cage* announced a new rule which would make it inapplicable to petitioner's habeas corpus claim under *Teague*. Petitioner states in his objection that, although the Fourth Circuit has recently ruled in *Adams v. Aiken*, 965 F.2d 1306 (4th Cir.1992), that *Cage* did indeed announce a new rule, the correctness of this ruling was raised by at least two certiorari petitions filed in the Supreme Court in the *Adams* case, supra., No. 92–6259 (pet. for certiorari filed Oct. 14, 1992) and *Taylor v. Whitley* (pet. for cert. filed Feb. 17, 1993) [11]. In a letter dated April 7, 1994, the petitioner's counsel informed this court that on March 28, 1994, the Supreme Court entered an order vacating and remanding the *Adams* case to the Fourth Circuit in light of *Sullivan v. Louisiana*, —— U.S. ——, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The petitioner is suggesting that this order indicates that the Fourth Circuit was incorrect in its decision that *Cage* did in fact create a "new rule" under *Teague*.

In response to petitioner's April 7, 1994, letter, the respondents' filed a brief on May 3, 1994. The respondents' argued that the *Teague* "new rule" issue was not even ad-

dressed in *Sullivan v. Louisiana* and thus this indicates that the Fourth Circuit decision that *Cage* created a new rule will be upheld. Respondents further argue that even if the Fourth Circuit on remand determines that *Cage* did not create a new rule under *Teague*, that this court should apply a recent case entitled *Victor v. Nebraska and Sandoval v. California*, —— U.S. ——, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). The *Victor* decision considered the constitutionality of two reasonable doubt instructions employing the "reasonable likelihood" standard set forth in *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). One of those instructions was somewhat similar to the instruction the petitioner's jury was given.

This court agrees with respondent that the *Victor* case provides the applicable analysis. This court finds that under *Victor* the petitioner received a constitutional reasonable doubt instruction, so it is unnecessary to determine whether *Cage* announced a "new rule" under *Teague*. As stated above, the petitioner's instruction was similar to one of the instructions in the *Victor* case. In the petitioner's case, the jury was told:

> Now, you have just heard me use the term reasonable doubt. What does it mean? The term reasonable doubt is to be given its plain, ordinary meaning. It means a substantial doubt arising out of the evidence or the lack of evidence in the case. The term reasonable doubt is a common, legal term used for many, many years and yet it still is difficult to define. The word reasonable means moderate, fair, not extreme or excessive.
>
> Now, a reasonable doubt is not an imaginary doubt or a fanciful doubt or a weak doubt or a slight doubt. As I previously said, a reasonable doubt is a substantial doubt which arises out of the evidence or the lack of evidence in the case for which a person honestly seeking to find the truth can give a reason.

Vol. III, p. 1282.

---

11. The petition for certiorari was subsequently denied in this case at —— U.S. ——, 113 S.Ct.

2935, 124 L.Ed.2d 684 on June 7, 1993.

The potential problem with this charge is the use of the term "substantial doubt." In *Victor*, the Supreme Court held that although the term "substantial doubt" can be somewhat problematic, the term must be read in the context of the sentence in which it appears. In the charge considered in *Victor*, the sentence containing the term "substantial doubt" stated: "A reasonable doubt is an actual and substantial doubt ... as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture." *Victor*, — U.S. at —, 114 S.Ct. at 1249–50. This court finds that the trial court's charge in this case is similar in that the trial judge stated that a reasonable doubt was not an imaginary doubt, or a fanciful doubt, or a weak doubt, or a slight doubt. The *Victor* Court compared the charge in that case to the one given in *Cage*. The Court noted that this explicit distinction between a substantial doubt and a fanciful conjecture was not present in the *Cage* instruction, and that in *Cage* they had held that the words "substantial" and "grave", as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. The Court noted, however, that it did not hold that the reference to substantial doubt alone was sufficient to render the instruction unconstitutional. In *Cage*, the Court was "concerned that the jury would interpret the term 'substantial doubt' in parallel with the preceding reference to 'grave uncertainty', which might lead to an overstatement of the doubt necessary to acquit." *Victor*, — U.S. at —, 114 S.Ct. at 1249–50. The Court stated that in one of the instructions given in the *Victor* case, "the context makes clear that 'substantial' is used in the sense of the existence rather than of the magnitude of the doubt, so the same concern is not present." *Id.* This court finds that this concern is not present in the charge given in the petitioner's case and finds that when the term "substantial doubt" is considered in context of the sentence in which it was contained and the entire charge, there is not a reasonable likelihood that the jury applied the charge in an unconstitutional manner.

Thus, after reviewing this matter *de novo*, this court finds that the petitioner's objec-tions are without merit, and the Magistrate Judge's report and recommendation, to the extent not inconsistent herewith, is adopted and incorporated herein, and the respondents' motion for summary judgment is hereby granted.

**IT IS SO ORDERED.**