Filed 3/28/13  P. v. Uribe CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RODOLFO RIVERA URIBE,<br><br>        Defendant and Appellant. | A131997<br><br>(Napa County<br>  Super. Ct. No. CR146945) |

Following a jury trial, defendant Rodolfo Rivera Uribe was convicted of first degree murder, shooting at an occupied motor vehicle, and various offenses for unlawful possession of a firearm.  On appeal, he contends that he received ineffective assistance of counsel because his trial counsel failed to request a pinpoint instruction concerning the effect of a mental disorder on his ability to form the specific mental states required for the murder charge and the special circumstance of lying in wait.  He also claims that concurrent sentences imposed for two of the three offenses for unlawful firearm possession should have been stayed under Penal Code section 654.[1]  We shall modify the judgment to stay the sentence on two of the three firearm possession offenses but otherwise affirm.

---

[1]        All further statutory references are to the Penal Code unless otherwise specified.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Procedural History*

Early in the morning on June 29, 2009, Uribe shot and killed Luis Octavio Carrillo with an assault rifle as Carrillo was sitting in a vehicle outside his residence with Uribe's former girlfriend. The Napa County District Attorney filed a seven-count amended information charging Uribe with murder (§ 187, subd. (a); count 1), shooting at an occupied motor vehicle (§ 246; count 2), kidnapping (§ 207, subd. (a); count 3), corporal injury to a spouse or cohabitant with a prior (§ 273.5, subds. (a) & (e); count 4), possession of a firearm by a felon (former § 12021, subd. (a)(1); count 5), possession of a firearm by a misdemeanant (former § 12021, subd. (c)(1); count 6), and possession of an assault weapon (former § 12280, subd. (b); count 7).[2] The district attorney further alleged as to the murder count that Uribe killed the victim while lying in wait (§ 190.2, subd. (a)(15)), and that he intentionally discharged a firearm at an occupied motor vehicle (§ 12022.5, subd. (b)(1)). It was also alleged as to the first two counts that Uribe personally discharged a firearm causing great bodily injury or death. (§ 12022.53, subd. (d).) As to the kidnapping charge in count three, it was alleged that Uribe personally discharged a firearm. (§ 12022.53, subd. (c).)

At trial, Uribe did not dispute that he killed Carrillo but claimed he was not thinking straight at the time because he was under the influence of alcohol and cocaine. His counsel urged a manslaughter verdict, arguing that Uribe lacked the ability to premeditate and deliberate due to his intoxication and mental disorders that made him act impulsively.

The jury found Uribe guilty of first degree murder, shooting at an occupied motor vehicle, and the three charged firearm possession offenses. He was acquitted of the

---

[2]     Effective January 1, 2012, the statutes defining the firearm possession offenses charged against Uribe were repealed and reenacted without substantive change, but with different statutory designations, as follows: former section 12021, subdivision (a)(1) was reenacted as section 29800, subdivision (a)(1); former section 12021, subdivision (c)(1) was reenacted as section 29805; and former section 12280, subdivision (b) was reenacted as section 30605. (See Stats. 2010, ch. 711, §§ 4, 6, 6.76.)

charges for kidnapping and corporal injury on a cohabitant as well as lesser included offenses of those charges. The jury found the lying-in-wait special circumstance and the firearm use allegations to be true as to the offenses of which Uribe was convicted.

The trial court sentenced Uribe to an indeterminate life term without the possibility of parole for the murder conviction, plus a term of 25 years to life for the associated firearm use enhancement pursuant to section 12022.53, subdivision (d). The court stayed the remaining firearm use enhancements as well as the sentence associated with the conviction for shooting at an occupied motor vehicle. The court imposed two-year concurrent terms for each of the three firearm possession offenses of which Uribe was convicted.

### Relationship with Jane Doe

Uribe's longtime girlfriend, Jane Doe, testified that she started dating him when they were both teenagers. Doe was already pregnant when they started dating, although Uribe raised the child as his own. Uribe and Doe moved in together and had another child. The relationship was tumultuous and led to incidents of domestic violence.

Doe ended her relationship with Uribe and moved out of their house on February 14, 2009. She told police officers that Uribe had a hard time with the break up and that he told her he did not want to see her with anyone else, going so far as to say he would kill her and any guy she was with. In late March 2009, Doe started dating the victim, Luis Octavio Carrillo.

In early June 2009, Uribe sent four threatening text messages to Carrillo over the course of several hours late in the evening and early the following morning. Several of the messages included a profanity-laced warning that Carrillo better watch out for himself. One message warned, "Hope that you find me first because I'm not gonna tell you again that lead is coming your way." The final message again cautioned Carrillo to watch out for himself and concluded, "I'm almost there, fool, and it's gonna cost you your life. Ha ha ha ha ha."

### *Night of the Murder*

On June 28, 2009, Doe and Uribe took their kids shopping. After dropping Uribe and the kids at his home in Napa, Doe made arrangements to see Carrillo. At around 9:30 or 10:00 p.m., Doe drove her BMW to Carrillo's home in Calistoga.

At about 1:30 a.m., Doe hugged Carrillo on the front porch of his house as she was leaving to return home. They walked to Doe's car with their arms around each other. They both got into the car, with Doe in the driver's seat and Carrillo in the passenger seat. After Doe started the car, Uribe approached from the right front side of the vehicle. He was wearing a black jacket and black jeans, and was holding an SKS assault rifle.

Uribe shot Carrillo through the closed passenger window, shattering the glass. Uribe cocked the gun and fired a second shot at Carrillo. After Uribe pulled Carrillo from the car and threw him onto the ground, he directed Doe to drive away. When paramedics arrived on the scene, Carrillo was dead.

A couple blocks away from the scene of the shooting, Doe noticed Uribe driving his father's car behind her. He flashed his lights at her and called her on her cell phone, telling her to follow him. They drove to Santa Rosa, and while en route, Uribe called his friend, Daniel Eames, who lived in Santa Rosa. Uribe asked Eames if he could leave a car at his house. Eames said that was fine. When Uribe arrived at Eames's house, Uribe backed Doe's BMW into the driveway. Eames noticed the BMW had a broken window and also saw blood dripping from the door jamb. Eames told Uribe he could not leave the car there and eventually convinced Uribe to take the car to a place where he had seen a house for rent. Uribe drove the BMW and followed Eames to a property with a "For Rent" sign. Doe followed in Uribe's father's car. Uribe parked the BMW in the carport and put a towel over the broken passenger side window. He then got into the passenger seat of his father's car and told Doe to drive back to Napa.

On the drive back to Napa, Uribe punched Doe in the back of the head four times. He told Doe he shot Carrillo in front of her so she could witness the killing and asked her, "How does it feel to know someone died because of you?" Uribe told her she was lucky the gun jammed or else he would have fired all 30 rounds.

4

Uribe instructed Doe to drive to his parents' house in Napa so that he could switch cars. After switching cars, he drove Doe to her house and went inside with her. Uribe hit Doe, directed her into the bedroom, and had sex with her.

In the morning, Uribe told Doe she had to go to work. He instructed her to take a shower with tomato juice to get the gunpowder off her skin. He took Doe to work and told her not to talk to the police. He also told her not to use her cell phone on the account they shared together.

### *Aftermath*

While at work on the day after the shooting, Doe spoke to some friends and decided to go to the police. Doe was placed in a witness relocation program but was ultimately terminated from the program after she returned to Napa to visit Uribe.

At about 9:00 a.m. on the morning after the shooting, the owner of the rental property in Santa Rosa at which the BMW had been left discovered the car and notified the police. Officers responded and searched the BMW. In the trunk, they found a loaded semiautomatic rifle beneath a towel. When the officers test-fired the gun, it jammed about every other attempt. They determined the cartridge casings found at the scene of the shooting were fired by the rifle recovered in the BMW. One of the casings found at the scene of the shooting had damage consistent with a jamming of the weapon, and a live round found at the scene appeared to have been ejected at the same time as the jammed cartridge casing.

On June 30, 2009, Uribe exchanged text messages with his friend, Jose Valdez. One text from Uribe read, "I'm a G, brother, no one fucks with me, I walk the walk, carnal, not just sell tickets loco, stay up, I'll be back, not done yet, LOL." Uribe also wrote, "I handle mines loco, LOL, no one disrespects me, I ain't a sucka, and erase all this 'cause it's just a dream." After Valdez informed Uribe that he had made the front page of the newspaper, Uribe texted, "[Y]eeeaaaahhhh, boy."

5

*Defense Case*

Uribe testified in his own defense at trial. He admitted that he and Doe had a stormy relationship. In late 2008, he began drinking heavily to cope with relationship problems. The relationship deteriorated and Doe left home on February 14, 2009.

In May 2009, Uribe learned that Doe was dating Carrillo. He admitted sending threatening text messages to Carrillo in early June, but stated he was under the influence of alcohol at the time. He also testified that he did not intend to follow up on his threats and "most likely" wanted to scare Carrillo away from Doe.

On June 28, Uribe and Doe took the children shopping at the mall. They had spent the previous night together, and Uribe believed they were back together as a couple. According to Uribe, he and Doe made plans to go to a movie together at around 9:00 p.m. Doe dropped Uribe and the kids at his parents' house, and while he was waiting for her to come back, he drank a 24-ounce can of malt liquor. Doe did not return. Uribe tried to text and call her, but she did not respond. He drank another 24-ounce can of malt liquor and ingested about two-and-a-half grams of cocaine.

Uribe took his father's car and tried to find Doe at her friends' houses in Napa. He testified that he placed the assault rifle in his father's car the day before because his parents did not want it in their house. When he could not locate Doe in Napa, he drove to Calistoga because Doe had female friends that lived there. Uribe testified that he did not suspect Doe was with Carrillo and claimed he did not know where Carrillo lived.

At around midnight, Uribe bought another can of malt liquor and began driving the streets of Calistoga looking for Doe. Eventually, he saw Doe's BMW parked on the street. He went back to the store to buy another beer and then parked down the street from the BMW. Over the course of the evening, Uribe had continued to ingest cocaine, and in the early morning hours of June 29, he had sent a text message to his dealer to buy an 8-ball. After he drank the second malt liquor he had purchased, Uribe noticed Doe and Carrillo walking to the BMW. Uribe became angry and jealous after seeing their arms around each other. He got the rifle out of his trunk, walked up to the car, and fired twice. The gun jammed after the first shot and had to be cleared before Uribe could fire

6

the second shot. Uribe testified that he could not recall aiming, pulling the trigger, seeing the window break, pulling Carrillo out of the car, or getting into his car. His next distinct memory was driving in Santa Rosa to Eames's house. According to Uribe, he was not thinking straight that night because he was under the influence of the alcohol and cocaine he had consumed.

The following day, Uribe returned to Santa Rosa to move the BMW but saw that the police were already there. Uribe headed south and stopped to get a new cell phone. He continued traveling south to Southern California and ended up at a relative's house in Compton.

Doe's brother testified for the defense and stated that he believed his sister often took advantage of Uribe during the relationship. In late 2008, Doe's brother noticed comments on Uribe's MySpace page about his mind playing tricks on him and hearing voices. Uribe also mentioned to Doe's brother on two occasions that he was hearing voices. In early 2009, Doe's brother noticed that Uribe had increased his alcohol and drug use, and he observed that Uribe was often unshaven and exhibited poor hygiene after Doe left him. Doe admitted she teased Uribe about talking to himself.

A forensic toxicologist testified that Uribe's blood alcohol level was likely between .19 and .23 at the time of the shooting, based on the amount and type of alcohol Uribe claimed to have consumed that night. The toxicologist explained that an experienced drinker would not necessarily exhibit outward symptoms of intoxication at those levels. The toxicologist also explained that cocaine typically contributes to irritability and aggressive impulses, and that it can mitigate the depressive effects of alcohol, causing an individual with a high blood alcohol level to be more alert than he might be otherwise.

In March 2010, while Uribe was in county jail, staff members at the jail referred Uribe to Dr. Stancil Johnson, a psychiatrist. Dr. Johnson had been told that Uribe was staying by himself and having little contact with others in the jail. After interviewing Uribe, Dr. Johnson determined he "probably had a schizophrenia" and prescribed medication. Dr. Johnson based his diagnosis in part on the fact Uribe said he had been

7

hearing voices since he was 11 years old.  Uribe also exhibited a flat affect common in schizophrenics.  After several changes in dosage, Uribe seemed to respond to the medication, further confirming Dr. Johnson's diagnosis.

Dr. Johnson believed Uribe was not malingering and that he suffered from schizophrenia for a good deal of his life.  Dr. Johnson testified that schizophrenia could affect a person's control and judgment, and it could lower inhibitions especially in conjunction with alcohol and cocaine use.

A psychologist hired by the defense, Dr. William Foreman, first met Uribe in August 2009.  Dr. Foreman diagnosed Uribe with chronic post-traumatic stress disorder (PTSD), major depressive disorders with psychotic features, and polysubstance dependence.  According to Dr. Foreman, Uribe's exposure as a child to gang violence, drive-by shootings, and confrontations at school and at home triggered his PTSD.  Dr. Foreman testified that symptoms of PTSD are similar to those experienced by persons suffering from schizophrenia.  He explained that individuals with PTSD often isolate themselves and have trouble concentrating.  They tend to distance themselves from their own feelings and end up building into a rage that can be triggered in an instant.  Dr. Foreman opined that the content of Uribe's text messages to Jose Valdez after the murder were consistent with someone suffering from PTSD, because PTSD sufferers often try to mask their vulnerability with exaggerated bravado.

Dr. Foreman believed Uribe's judgment, reasoning, and ability to control his impulses would have been impaired on the night of the murder, taking into account the amount of alcohol Uribe claimed to have consumed.  He also testified that cocaine use would allow an individual to feel emotions more intensely.  Dr. Foreman stated that Uribe did not report having any disordered thinking, auditory hallucinations, or delusions on the night of the murder.  However, he did believe that Uribe's mental disorders could impair his ability to plan, control behavior, and exercise executive functions over his thoughts.

8

*Rebuttal*

A psychiatrist hired by the prosecution, Dr. James Missett, believed Uribe was depressed and anxious but felt that those symptoms resulted from the fact Uribe was incarcerated and facing murder charges. Dr. Missett administered several psychological tests to Uribe and concluded the results were consistent with diagnoses of anxiety, depression, and possibly PTSD. However, Dr. Missett found no indication of schizophrenia. Although he believed it was likely Uribe was depressed and anxious on the night of the murder, Dr. Missett testified that it appeared Uribe was still able to function "okay in terms of getting done things that he wants to get done for himself." He based his conclusion in part on the fact that Uribe's conduct, such as fleeing the scene, hiding the car, and threatening Doe to avoid having her talk about the murder tended to show "organized thinking."

Another psychiatrist called by the prosecution, Dr. William Lynch, reviewed the psychological testing done by Dr. Missett and Dr. Foreman. According to Dr. Lynch, several of the tests were invalid due to inconsistent or exaggerated answers. Dr. Lynch also testified that several of the tests showed indications that Uribe might be malingering.

## DISCUSSION

### 1. *Ineffective Assistance of Counsel*

Uribe contends his trial counsel provided constitutionally ineffective assistance by failing to ask the court to instruct the jury with CALCRIM No. 3428, which concerns the effect of a mental disease, defect, or disorder on a defendant's ability to deliberate or premeditate.[3] As we explain, even assuming counsel's performance was deficient, Uribe's claim fails because he cannot demonstrate a reasonable probability the outcome would have been any different if his counsel had requested the instruction.

---

[3] For ease of reference, we shall use the term "mental disorder" to refer collectively to the phrase "mental disease, defect or disorder" as used in CALCRIM No. 3428.

9

### a. *Governing Legal Principles*

In order to establish a claim of ineffective assistance of counsel, a defendant bears the burden of demonstrating both that counsel's performance fell below an objective standard of reasonableness (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688) and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694; *People v. Ledesma* (2006) 39 Cal.4th 641, 746.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925.)

"Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.] If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " (*People v. Ledesma, supra,* 39 Cal.4th at p. 746.)

### b. *Background*

Uribe's defense at trial was that he was provoked and acted impulsively when he shot Carrillo. His counsel emphasized that alcohol and drugs clouded Uribe's judgment and that Uribe suffered from mental problems that impaired his ability to premeditate and deliberate. In closing argument, Uribe's counsel urged the jury to find his client guilty of manslaughter, concluding as follows: "They've failed to show the premeditation, they've failed to show the deliberation, the mature, the thoughtful logical thinking that has to go into this. It's just as likely that [Uribe's] acts were rash, impulsive and without consideration or deliberation."

At the request of defense counsel, the trial court instructed the jury with CALCRIM No. 625, which concerns the weight to be given to evidence of a defendant's voluntary intoxication. The instruction given to the jury reads, in part, as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited

10

way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation or whether the defendant intended to conceal his purpose, waited for an opportunity and made a surprise attack on the person from a position of advantage."

Defense counsel did not ask the court to instruct the jury with CALCRIM No. 3428, which is similar to the instruction on how to weigh evidence of voluntary intoxication (CALCRIM No. 625) except that it concerns the weight to be given to evidence the defendant suffered from a mental disorder. CALCRIM No. 3428 directs a jury to consider evidence of a mental disorder only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for the crime.[4] The record on appeal sheds no light on why counsel requested an instruction on how to weigh evidence of voluntary intoxication but did not request a similar instruction applicable to evidence of a mental disorder.

### c. *Analysis*

Uribe argues that his counsel's performance was constitutionally defective because there could be no conceivable tactical reason for failing to request CALCRIM No. 3428. The Attorney General suggests that defense counsel may have had a valid tactical reason for the course of action if counsel determined it was better to focus

---

[4]    In its standard form, CALCRIM No. 3428 reads: "You have heard evidence that the defendant may have suffered from a mental (disease[,]/ defect[,]/ [or] disorder). You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with the required intent or mental state, specifically: _____ *<insert specific intent or mental state required, e.g., 'malice aforethought,' 'the intent to permanently deprive the owner of his or her property,' or 'knowledge that the . . .'>*. If the People have not met this burden, you must find the defendant not guilty of _____ *<insert name of alleged offense>*. [¶] *<Repeat this paragraph for each offense requiring specific intent or a specific mental state.>* [¶] [Do not consider evidence of mental (disease[,]/ defect[,]/ [or] disorder) when deciding if _____ *<insert name of nontarget offense>* was a natural and probable consequence of _____ *<insert name of target offense>*.]"

primarily on the provocation and intoxication defenses. It is unnecessary for us to resolve whether defense counsel's performance was constitutionally defective because we can dispose of Uribe's ineffective assistance claim by focusing on the prejudice component of the analysis. (See *In re Alvernaz* (1992) 2 Cal.4th 924, 945; see also *Strickland v. Washington, supra,* 466 U.S. at p. 697 ["[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"].)

Under the circumstances presented here, Uribe cannot demonstrate a reasonable probability the outcome would have been any more favorable if his counsel had requested CALCRIM No. 3428. Among other things, there was ample evidence that Uribe premeditated and lay in wait before killing Carrillo. He had threatened to kill the victim in the month before the shooting and had told Doe he would kill her and anyone she dated. On the night of the murder, Uribe wore dark clothing, drove to Calistoga at midnight with an assault rifle in the trunk of his car, and waited near Doe's vehicle until she returned with Carrillo. After Uribe shot Carrillo the first time and the gun jammed, Uribe had the presence of mind to clear the jam and shoot the victim a second time. He then methodically disposed of the evidence and fled to Southern California. As Dr. Missett testified, Uribe's actions on the night of the murder tended to show that, even though Uribe may have been suffering from anxiety and depression, he exhibited "organized thinking." Further, even an expert called by the defense, Dr. Foreman, stated that Uribe did not report having any disordered thinking, hallucinations, or delusions on the night of the murder.

The omission of CALCRIM No. 3428 did not remove from the jury's consideration or incorrectly define the elements of the charged offenses. The trial court instructed the jury on the law applicable to the evidence presented, including the various mental states and specific intents required to establish the charged crimes. At the request of defense counsel, the court also read the pinpoint instruction directing the jury to

12

consider evidence of voluntary intoxication for the limited purpose of deciding whether Uribe has the requisite mental states or intent. Uribe was allowed to present expert testimony concerning the nature and effect of his claimed mental disorders, and the jury was instructed how to consider and evaluate expert opinion testimony.

Moreover, the jury was well aware that Uribe's defense was that he did not premeditate or lie in wait. Defense counsel emphasized in closing argument that Uribe's ability to premeditate and to plan was impaired by mental disorders as well as his intoxication, as follows: "If he's impaired, if he's impaired when these doctors see him a year and a half afterwards, the likelihood is that he had major mental problems a year and a half earlier. . . . [¶] It impairs his ability to premeditate and deliberate, to plan, to lie in wait with a plan from ambush, to plan the homicide and then execute it when the time is right. . . . [¶] You cannot say beyond a reasonable doubt that Mr. Uribe had the ability to do these things on top of everything else, on top of the intoxication, on top of the impulsive act which the posttraumatic stress disorder feeds, this highly symptomatic, the high startle reflex that is characteristic of the posttraumatic stress disorder."

Therefore, the jury heard the evidence supporting the mental disorder defense and was urged to consider it when deciding whether Uribe acted with the requisite intent and mental state. The omission of CALCRIM No. 3428 did not result in a misstatement of the intent element of the charged offenses. "CALCRIM No. 3428 does not delineate or describe an element of an offense." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 830.) It is in the nature of pinpoint instruction that highlights the defense *theory* of the case, as opposed to a general principle of *law* that a court must give sua sponte if supported by the evidence. (See *People v. Homick* (2012) 55 Cal.4th 816, 890; *People v. Larsen, supra,* 205 Cal.App.4th at pp. 824, 830; see also *People v. Ervin* (2000) 22 Cal.4th 48, 91 [discussing CALJIC No. 3.32, predecessor to CALCRIM No. 3428].) The jury necessarily considered whether Uribe possessed the requisite intent or mental state associated with the charged crimes. The omission of CALCRIM No. 3428 may have deprived Uribe of a singular, distinctive focus on the impact of his purported mental disorders as they relate to the issue of intent, but it did not leave jurors with the

13

misconception that they must in any way discount the expert testimony or the mental disorder defense. "Nothing in the instructions or argument precluded the jury from at least assessing the mental disorder evidence–and specifically the expert testimony–on the issue of intent." (*People v. Larsen, supra,* 205 Cal.App.4th at. p. 833.)

Uribe contends that his trial counsel's focus on the mental disorder defense in closing argument was an inadequate substitute for the missing instruction. We disagree. As support for the notion that argument of counsel is not a substitute for a jury instruction, he cites a case in which a court refused to give an instruction on the effect of a defendant's failure to testify (*Carter v. Kentucky* (1981) 450 U.S. 288, 294) and he cites another case in which a court failed to inform the jury the defendant was presumed to be innocent and that the prosecution had the burden of proving guilt beyond a reasonable doubt (*People v. Vann* (1974) 12 Cal.3d 220, 225). In *Carter v. Kentucky,* the United States Supreme Court held a trial court has a constitutional obligation to give a requested instruction on the effect of a defendant's failure to testify. (*Carter v. Kentucky, supra,* at p. 305.) In *People v. Vann,* our Supreme Court pointed out that the omitted instructions stated general principles of law that the court had a sua sponte obligation to give to the jury. (*People v. Vann, supra,* at pp. 225-226.) By contrast, the omitted instruction in this case did not state a constitutional precept or a general principle of law but instead merely pinpointed a defense theory consistent with the instructions given to the jury.

Uribe also claims his counsel may have undermined his credibility by arguing the mental disorder defense to the jury without the support of an instruction. The case law relied upon by Uribe for this proposition is inapposite. He cites *United States v. Duncan* (6th Cir. 1988) 850 F.2d 1104, 1117-1119, overruled on other grounds in *Schad v. Arizona* (1991) 501 U.S. 624, 634, in which the court concluded that counsel's closing argument was more harmful than helpful when it appeared to be contrary to and was precluded by the instructions given to the jury. Here, nothing in the instructions given to the jury precluded it from considering the effect of Uribe's purported mental disorders on the issue of his intent or mental state. Thus, there is no reason to believe the jury would have discounted the mental disorder argument advanced by Uribe's trial counsel, or the

evidence supporting it, simply because the jury instructions omitted a pinpoint instruction specifically addressed to that issue.

Because we conclude Uribe cannot demonstrate that he was prejudiced as a consequence of his counsel's failure to request CALCRIM No. 3428, we reject his claim of ineffective assistance of counsel.

**2.** *Sentencing Error*

Uribe was convicted in count 5 of possession of a firearm by a felon (former § 12021, subd. (a)(1)), in count 6 of possession of a firearm by a misdemeanant (former §12021, subd. (c)(1)), and in count 7 of possession of an assault rifle (former § 12280, subd. (b)).  The court imposed two-year concurrent sentences for each of the three firearm possession offenses.  Uribe contends the sentences on two of the three counts should be stayed pursuant to section 654.  The Attorney General concedes the trial court erred in imposing concurrent sentences on all three of the firearm possession offenses.

Section 654 prohibits multiple punishment for a single act or an indivisible course of conduct.  (§ 654; *People v. Deloza* (1998) 18 Cal.4th 585, 591.)  Imposition of a concurrent sentence is considered multiple punishment under section 654.  (See *People v. Jones* (2012) 54 Cal.4th 350, 353.)  Instead of imposing concurrent sentences, "the accepted 'procedure' is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable."  (*Ibid*.)

The basis for the three firearm possession convictions was Uribe's possession of the SKS assault rifle on the day of the murder.  "[A] single possession or carrying of a single firearm on a single occasion may be punished only once under section 654."  (*People v. Jones, supra,* 54 Cal.4th at p. 357.)  Therefore, the judgment should be modified to provide that the sentences on two of the three firearm possession offenses are stayed pursuant to section 654.

## DISPOSITION

The judgment is modified to reflect that the sentences associated with count 6 (former § 12021, subd. (c)(1)) and count 7 (former § 12280, subd. (b)) are stayed

15

pursuant to section 654. The trial court is directed to prepare an amended abstract of judgment in accordance with this disposition and deliver it to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


_____
McGuiness, P. J.


We concur:


_____
Siggins, J.


_____
Jenkins, J.